Submitted on record and briefs March 16, on appeal, order granting new trial vacated, jury verdict reinstated and remanded; affirmed on cross-appeal December 19, 1990, Purcell's reconsideration and Trustees of Bronson's reconsideration denied March 27, both petitions for review allowed April 30, 1991 (311 Or 349)

## ONITA PACIFIC CORPORATION,
John A. Dante and Jeanine Dante,
*Appellants - Cross-Respondents,*

*v.*

## TRUSTEES OF CHARLES D. BRONSON
and Warde H. Erwin,
*Respondents - Cross-Appellants,*

Clyde PURCELL
and L. A. Swarens,
*Respondents,*

*and*

Lawrence W. ERWIN,
John Compton, Douglas K. Siebert and
Dorothy L. Siebert and Douglas Cascade Corporation,
*Defendants.*

(A8607 04518; CA A46940)

803 P2d 756

I. Franklin Hunsaker, Douglas G. Houser, James G. Driscoll, Lisa E. Lear and Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, filed the briefs for appellants - cross-respondents.

James H. Clarke and Spears, Lubersky, Bledsoe, Anderson, Young & Hilliard, Portland, filed the brief for respondents.

Warde H. Erwin, *pro se*, and Charles C. Erwin, Portland, filed the briefs for respondents - cross-appellants.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Plaintiffs brought this action for reformation of an agreement by which defendants consented to the assignment of a vendee's interest in a land sale contract. In the alternative, they allege that defendants,[1] acting as joint venturers, breached their duty of good faith and fair dealing under the contract, fraudulently or negligently misrepresented their duty to release deeds to lots under the land sale contract and intentionally interfered with plaintiffs' contract with third parties. The reformation action was tried to the court first, after which the court made findings and concluded that plaintiffs were not entitled to reformation. However, no judgment was entered on that claim until the judgment was entered disposing of the rest of the claims.

The court then granted defendants' motion under ORCP 21A to dismiss plaintiffs' claims for breach of the duty of good faith and fair dealing and for intentional interference with contract. After plaintiffs had presented their evidence to the jury on the remaining claims, the court granted defendants' motions for directed verdict on the claim of fraud and denied their similar motions on the negligent misrepresentation claim. Only the negligent misrepresentation claim was submitted to the jury.

The jury returned a verdict for plaintiffs. The court denied defendants' motions for judgment notwithstanding the verdict but granted their motions for new trial on the ground that it had given an improper damages instruction. Plaintiffs appeal, assigning error to the order granting a new trial; if we affirm that order, they assign error to the judgment dismissing the other claims. They also assign error to the award of attorney fees to defendants on the contract claim. Defendants cross-appeal, assigning error to the court's denial of their motions for a directed verdict and for judgment notwithstanding the verdict on the claim of negligent misrepresentation.

We recite the facts in the light most favorable to

---

[1] No relief was sought against Compton. Plaintiffs voluntarily dismissed their claims against Lawrence Erwin. The claims against the Sieberts and Douglas Cascade Corporation are not involved in this appeal. Throughout this opinion, we use the term "defendants" to refer to Warde H. Erwin, Clyde Purcell, L. A. Swarens and the trustees of Charles D. Bronson, each of whom was a partner in the joint venture to own and sell the real property involved in this case.

plaintiffs. *Brown v. J. C. Penney Co.,* 297 Or 695, 688 P2d 811 (1984); *Jacobs v. Tidewater Barge Lines,* 277 Or 809, 562 P2d 545 (1977). In 1973, Camomile sold three parcels of undeveloped land to defendants by a land sale contract (Camomile contract). In January, 1979, defendants sold their vendees' interest in two of the three parcels (Wild Horse Plains and Wild Horse Meadows) to Robert Hatch by a land sale contract (Hatch contract). Defendants and Hatch contemplated that the parcels would be subdivided and that individual lots would be sold separately. Therefore, the contract provided that deeds for each lot would be placed in escrow, with escrow instructions for their release on certain conditions.

Hatch assigned his interest in the contract to Compton. Compton decided to sell his interest in the contract and asked Reed Brothers Realty to locate a buyer. Siebert and plaintiffs Dante became interested in the property. In comparing the language of the Hatch contract with the escrow instructions, it was not clear to Siebert whether the two documents required the escrow agent to release the deed to each lot on the payment of the sum specified in the escrow instructions or whether they required a release only after a lot was resold to a third party. The escrow instructions for Wild Horse Meadows provided, in part:

> "You are authorized to accept each of said deeds in behalf of the undersigned and to hold the same for *delivery to Robert A. Hatch or his order when you have in your possession for delivery to the undersigned, the sum of $12,000. for each of said parcels lying East of the Camp Polk Road and $18,000. for each of said parcels lying West of Camp Polk Road."* (Emphasis supplied.)

The escrow instructions for Wild Horse Plains provided, in part:

> "You are authorized to accept each of said deeds in behalf of the undersigned and to hold the same for *delivery to Robert A. Hatch or his order when you have in your possession for delivery to the undersigned the sum of $12,000. for each of said parcels."* (Emphasis supplied.)

Although the escrow instructions, which are incorporated in the contract, are clear and unambiguous, and do not require a third party resale, the contract, read in its entirety, *is*

ambiguous. In the provision entitled "Consideration," the Hatch contract provides:

> "The full consideration to be paid from Purchaser to Sellers is the sum of ONE MILLION ONE HUNDRED AND EIGHTY-FIVE THOUSAND DOLLARS ($1,185,000.00) which shall be paid in the following manner:

> "ONE HUNDRED TWENTY THOUSAND DOLLARS ($120,000.) upon final closing of this agreement and not more than 120 equal installments of not less than NINE THOUSAND DOLLARS ($9,000.00) monthly plus interest on the unpaid principal balance at the rate of 9-1/2% (nine and one-half) per annum from final closing until paid[.]"

The next provision of the contract is entitled "Additional Payment":

> "Purchaser hereby agrees that the property to be sold *is to be developed for resale to others* in accordance with a development plan and restrictive covenants and conditions, copies of which are attached to this agreement and made a part hereof by reference.

> "*Upon the resale* of any of the parcels developed for resale the Purchaser shall pay to Sellers a sum equal to $1,200.00 per acre of land contained within the perimeter of such parcel or parcels lying east of the Camp Polk Road and $1,800.00 per acre of land contained within the perimeter of such parcels lying west of the Camp Polk Road.

> "Payments of said sums shall be made in the following manner:

> "Cash Sale:   *Payment* shall be made to the Sellers at the time of receipt but *may be made directly to the escrow agent holding deeds for release to Purchaser upon payment of the aforesaid sums unless Sellers give to Purchaser a receipt showing payment in full of said sums for delivery to the escrow agent sufficient to secure release of the deed to such parcel.*

> "Contract:   In the event of resale of the various parcels upon a contract of sale, payments shall be made according to the following formula:

> "Purchaser shall place the contract in escrow with an escrow agent with instructions to pay to Sellers' escrow agent that portion of all net sums received which the sum of $1,200.00 an acre bears to the gross resale price if the parcel lies east of Camp Polk Road and $1,800.00 bears to the gross resale price if the parcel lies west of Camp Polk Road.

"In the event that the aforesaid payment (cash or contract) plus the monthly installment, plus the down payment, exceed $350,000.00 during the calendar year of 1979, then such payment in excess of $350,000.00 shall be placed in a special interest-bearing account in a federally insured savings and loan organization in Deschutes County, Oregon, with authorization to release upon the dual signatures of Purchaser or his agent and one of the Sellers.

"Payments made to the separate account shall not be credited against the principal balance due on the purchase price under this agreement but the interest on said deposits shall be the property of the Purchaser and shall be payable to Purchaser from date of deposit until released.

"Following the end of the 1979 calendar year, all such accumulation of payment shall be released to Sellers' escrow agent and credited against the principal balance due under this agreement and thereafter the payments shall be made as received in accordance with the aforesaid formula directly to the Sellers' escrow agent.

"It is specifically understood that the formula payments are made for the specific purpose of substitution of security in order to permit the purchaser to enter into resale agreements with others and to commit to said resale a conveyance of the property free of the claims of Purchaser and to substitute in place of said property the aforesaid formula payments." (Emphasis supplied.)

The contract later refers generally to the deeds and their placement in escrow:

"Sellers have placed in escrow deeds for the conveyances of each of the properties developed for resale and likewise deeds for the conveyance of all common ground retained for use of the resale purchasers[.] * * *

"*Escrow instructions have been given to the escrow agent which said instructions direct release of said conveyances when and as the terms of this agreement are complied with.*" (Emphasis supplied.)

The "Additional Payment" provision of the contract leaves no doubt that the objective of the contract is that the lots be developed for resale. Although the provision does not expressly state it, its last paragraph suggests that the parties intend that deeds be released after payment of the amounts described in the contract. It does not, however, expressly *condition* release of the deeds on sales to third parties.

Siebert asked Reed Brothers about that discrepancy, and defendant Warde Erwin provided Reed Brothers with a letter[2] explaining how the lots were to be released. Siebert understood the letter to say that sales to third parties were not prerequisites to releases of the deeds, and that they would be released on payment of the amounts specified in the escrow instructions.

In negotiating the sale, Siebert met with Warde Erwin, who told him that he spoke for all defendants, and that Siebert should deal with Lawrence Erwin, the joint venture's attorney. Negotiations continued, and Warde and Lawrence Erwin prepared, and plaintiffs signed, a document entitled "Modification of Agreement," which modified the terms of the Hatch contract in certain respects irrelevant to this dispute and gave defendants' consent to the assignment by Compton of his vendee's interest under the Hatch contract to the Dante Joint Venture, comprised of Douglas Cascade Corporation (owned by Siebert and his wife) and Onita Pacific Corporation (owned by John Dante and his wife).

Shortly before signing the agreement, defendants demanded that the Dante Joint Venture make an extraordinary payment of $200,000 on the balance due on the Hatch contract, so that defendants could pay off the balance due on the Camomile contract. The Dante Joint Venture did not have

---

[2] The letter reads:

"The record owner of the property (Betty Camomile) had placed in escrow deeds to each of the numbered lots in both subdivisions.

"Her escrow instructions as to Wildhorse Meadows * * * are to deliver each of the 35 deeds to [defendants] or as directed by them when certain sums are received by the escrow company for delivery to her. * * *

"There were 41 deeds delivered in escrow as to Wildhorse Plains with instructions to deliver the deeds to or as directed by [defendants] under the same escrow instructions and on the same terms as applied to Wildhorse Meadows.

"In turn, [defendants] delivered escrow instructions to the same escrow agent in regard to the same deeds to deliver each as directed by Hatch to prospective purchasers upon payment of $12,000. for all parcels East of Camp Polk Road and $18,000. for all parcels West of Camp Polk Road, and to pay to Betty Camomile the amounts required under her escrow instructions for release of the applicable deed and to remit the balance to [defendants].

"A prospective purchaser's deed therefore will go directly from Betty Camomile (the record titleholder) to the purchaser of a parcel or to Hatch (or his assignee) when Hatch has paid the required $12,000. or $18,000., and Hatch (or his assignee) could, of course, sell the property for whatever price desired."

$200,000 and could only afford to borrow the money if payment of that amount to defendants would result in the release of lots that it could then pledge as security for financing to complete the subdivision and to perform its obligations under the Hatch contract.

Lawrence Erwin assured Siebert that the deeds to 16 lots would be released on payment of the $200,000. The modification agreement does not mention the $200,000 payment or the release of the lots. The Dantes and the Sieberts signed that agreement on October 20, 1981, on the assurances of Lawrence that the agreement did not need to make express reference to the $200,000 payment, because it would be processed through the existing escrow account and would automatically result in a release of the deeds.

The Dante Joint Venture transferred to Compton properties worth $850,000 in exchange for his vendee's interest under the Hatch contract. Compton gave defendants his check for $200,000, and the Dante Joint Venture signed a $200,000 promissory note to Compton that was secured by an interest in the Wild Horse properties and other properties owned by Douglas Cascade and the Dantes, including the Dantes' dental office. Defendants paid Camomile the balance due her out of the $200,000, and she transferred title to the land to defendants.

Thereafter, Lawrence Erwin told Siebert that defendants wanted to change the escrow agent because of a fee dispute. Siebert agreed to the change on Lawrence's assurance that the escrow instructions would remain the same and that the Dante Joint Venture could rely on the escrow instructions for lot releases. Siebert also agreed to allow Lawrence to process the $200,000 payment through his own trust account, rather than through the escrow account, on his assurances that everything would proceed as though the check had been processed through the escrow account and that it would not affect the release of the deeds.

In November, 1981, Siebert met with Lawrence Erwin to designate which lots the Dante Joint Venture wanted released. Siebert identified 16 lots and made a formal request for the deeds. Lawrence told Siebert that defendants would be surprised by the lots that Siebert had chosen, because defendants had assumed that the Dante Joint Venture would

choose more expensive lots. Two weeks later, Lawrence informed the Dante Joint Venture that defendants would not release any lots and that the modification agreement did not require such releases in the absence of sales to third parties. He also sent the Dante Joint Venture a new set of escrow instructions that he had drafted and that were signed by defendants, permitting a lot release only on the sale of the lot to a third party or on payment of the entire balance outstanding under the Hatch contract.

The Dante Joint Venture continued to make the principal and interest payments due on the Hatch contract through May, 1982. However, as a result of defendants' refusal to release the deeds, the venture was unable to complete the capital improvements to the project, was unable to sell any lots to third parties and was unable to repay Compton. By June, 1982, the Dante Joint Venture had exhausted all of its funds. Compton took back the Wild Horse properties and foreclosed on all of the security given by the Dante Joint Venture, including the Dantes' dental office. The Sieberts and Douglas Cascade subsequently assigned all of their interest in the Dante Joint Venture to plaintiffs, who filed this lawsuit.

The court bifurcated the trial. After plaintiffs had presented their evidence on the reformation claim, the court rejected their contention that the modification agreement should be reformed to require expressly that deeds be delivered on payment of the amounts specified in the escrow instructions without requiring sales to third parties. In the reformation action, it made these findings:

"4.   The agreement claimed by plaintiffs, if made, was made by Douglas K. Siebert as agent for the Dante Joint Venture, on the one hand and by Lawrence Erwin for [defendants] on the other hand;

"5.   Plaintiffs have failed to prove that Lawrence Erwin had authority to bind [defendants] to any revisions in the Hatch Contract or the Modification of Agreement;

"6.   The Hatch Contract and its intended escrow instructions are ambiguous as to whether [defendants were] required to release deeds to lots upon an extraordinary principal reduction. I construe the Hatch Contract to only require the [defendants] to release deeds to lots upon development and resale to third parties, and payment of certain funds in

accordance with the Hatch Contract. The lot release provisions of the Hatch Contract were not changed by the Modification of Agreement dated October 20, 1981;

"7. Plaintiffs failed to prove that [defendants] had any intent to deceive the Dante Joint Venture or any of its members at any time with respect to any of the claims asserted by plaintiffs;

"8. Defendant John Compton paid [defendants] $200,000 on October 26, 1981 with specific instructions to disburse $172,885.93, plus accrued interest, to Betty Camomile and the balance to [defendants]. Mr. Comptons' [*sic*] purpose in making the payment was not to secure release of deeds in the Wild Horse property. [Defendants were] bound by the Hatch Contract to accept the payment from Mr. Compton and to disburse it according to his instructions; and

"9. [Defendants] did not ratify representations, if any, made by Lawrence Erwin to the Dante Joint Venture regarding the release of deeds upon any extraordinary principal reduction."

On appeal, plaintiffs have not assigned error to the court's ruling dismissing their reformation claim or to any of its findings. The negligent misrepresentation claim is based primarily on Lawrence Erwin's representations to plaintiffs about defendants' intentions concerning the lot releases. Defendants contend that the trial court's findings on the reformation claim concerning Lawrence's lack of authority to act on behalf of defendants and their failure to ratify his representations should bar plaintiffs' negligent misrepresentation claim.

When the negligent misrepresentation claim was submitted to the jury, the trial court had not entered a judgment on the reformation claim. Accordingly, we conclude that the court's findings on issues common to the negligent misrepresentation claim were not binding and did not prevent plaintiffs from having the jury decide those issues. *See Beacon Theatres, Inc. v. Westover,* 359 US 500, 79 S Ct 948, 3 L Ed 2d 988 (1959); *Godat v. Waldrop,* 78 Or App 374, 380, 717 P2d 180, *rev den* 302 Or 86 (1986); *Office Services Corp. v. CAS Systems,*

*Inc.,* 63 Or App 842, 666 P2d 297, *rev den* 295 Or 773 (1983).[3] For that reason, the negligent misrepresentation claim is not barred.

The complaint alleged that defendants negligently represented that, on payment of the $200,000, they would release the deeds to 16 of the parcels and that the contract and escrow instructions required them to do so. On appeal, plaintiffs seek to sustain the jury verdict by asking that we reverse the order granting defendants a new trial on the negligent misrepresentation claim. On the other hand, defendants contend that the court erred in failing to direct a verdict for them on the negligent misrepresentation claim, because negligent misrepresentation is not actionable in Oregon.

No Oregon case has decided whether a negligent misrepresentation is actionable. Several have found it unnecessary to reach the question. *See Duyck v. Tualatin Valley Irrigation Dist.,* 304 Or 151, 156 n 3, 742 P2d 1176 (1987); *Hevern v. Walter E. Heller Western, Inc.,* 103 Or App 200, 203, 796 P2d 1229 (1990); `Western Energy, Inc. v. Georgia Pacific,* 55 Or App 138, 637 P2d 223 (1981). Authorities that have recognized the existence of the tort of negligent misrepresentation have debated whether it sounds in negligence or deceit. *See* Prosser and Keeton, *Torts* 205, § 5; 745, § 18 (5th ed 1984). The question is particularly perplexing when, as here, only economic loss is involved. A claim of negligence is viewed traditionally as the remedy for personal injury or property damage. Where only intangible economic interests are

---

[3] Defendants also contend that any claim for negligent misrepresentation is barred by a clause in the Hatch contract that provides:

"There are no representations or warranties made by either party except as contained in this document. * * *

"* * * * *

"This contract is not capable of being modified in any manner except by a specific writing signed by both parties hereto referring to the portion to be altered or specifically stating that it is an addition thereto or alteration thereof."

However, plaintiffs' claim is based on the modification agreement, not the Hatch contract, and it does not contain a merger or disclaimer clause. Additionally, as we have stated, the Hatch contract is ambiguous concerning lot releases, and it is therefore not a foregone conclusion that defendants' alleged misrepresentations were inconsistent with its terms. Finally, we do not believe that a merger or disclaimer clause in the underlying contract should prevent the bringing of a claim for negligent misrepresentation in the *inducement* to purchase the vendee's interest in that contract, as asserted here. *See Wilkinson v. Carpenter,* 276 Or 311, 317, 554 P2d 512 (1976).

invaded, negligent misrepresentation is frequently characterized as deceit. Prosser and Keeton, *supra*, at 205.

Whether the claim is characterized as negligence or deceit, when the loss is only economic, courts have been concerned about permitting a claim that could impose liability for potentially unlimited damages. The tendency has been to limit the persons to whom a defendant may be liable:

> "[M]isrepresentation frequently occurs in ordinary negligence actions for personal injuries or property damage, in the form of misleading words or acts, or nondisclosure of known facts, and the courts have not found it necessary to distinguish it in any way from any other negligence. It is only where intangible economic interests are invaded that they have become alarmed at possible liability of unknown or virtually unlimited extent, and have developed a more restricted rule. This has taken the form of limitation of the group of persons to whom the defendant may be liable, short of the foreseeability of possible harm." Prosser and Keeton, *Torts,* 745, § 18.

> "When the harm that is caused is only pecuniary loss, the courts have found it necessary to adopt a more restricted rule of liability, because of the extent to which misinformation may be, and may be expected to be, circulated, and the magnitude of the losses which may follow from reliance upon it." *Restatement (Second) Torts,* § 552, *comment a.*

The Oregon Supreme Court has said that, assuming the existence of a claim for negligent misrepresentation, it sounds in negligence. *Duyck v. Tualatin Valley Irrigation Dist., supra,* 304 Or at 156. The court has also said that liability for the tort should be limited to cases where "the relationship of the plaintiffs to the defendants is sufficiently close to permit recovery of economic loss." *Duyck v. Tualatin Valley Irrigation Dist., supra,* 304 Or at 158. Little has been said to explain what type of relationship between the parties is required in order to create a duty sufficient to allow recovery of economic loss alone. In *Hale v. Groce,* 304 Or 281, 284, 744 P2d 1289 (1987), the court stated that, when economic loss alone is suffered, "[s]ome sort of duty *outside the common law of negligence* is required." (Emphasis supplied.) It also said that "[i]t does not suffice that the harm is a foreseeable consequence of negligent conduct that may make one liable to someone else, for instance a client." 304 Or at 284.

Although *Hale* did not involve misrepresentation, we

believe that its discussion about negligence claims for economic loss alone is pertinent. As we understand that discussion, in order to impose liability in negligence for economic loss alone, there must be some relationship between the parties that gives rise to a duty other than that which exists simply by virtue of the foreseeability of harm. The *Restatement* has formulated a statement of what that might encompass when the negligence involves a misrepresentation:

> "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."
> *Restatement (Second) Torts,* § 552.

In comparing the claim of negligent misrepresentation to fraud, *comment a* explains the nature of the relationship required for liability:

> "The reason a narrower scope of liability is fixed for negligent misrepresentation than for [fraud] is to be found in the difference between the obligations of honesty and of care, and in the significance of this difference to the reasonable expectations of the users of information that is supplied in connection with commercial transactions. Honesty requires only that the maker of a representation speak in good faith and without consciousness of a lack of any basis for belief in the truth or accuracy of what he says. The standard of honesty is unequivocal and ascertainable without regard to the character of the transaction in which the information will ultimately be relied upon or the situation of the party relying upon it. Any user of commercial information may reasonably expect the observance of this standard by a supplier of information to whom his use is reasonably foreseeable.

> "On the other hand, it does not follow that every user of commercial information may hold every maker to a duty of care. Unlike the duty of honesty, the duty of care to be observed in supplying information for use in commercial transactions implies an undertaking to observe a relative standard, which may be defined only in terms of the use to which the information will be put, weighed against the magnitude and probability of loss that might attend that use if the information proves to be incorrect. A user of commercial information cannot reasonably expect its maker to have

undertaken to satisfy this obligation unless the terms of the obligation were known to him. Rather, one who relies upon information in connection with a commercial transaction may reasonably expect to hold the maker to a duty of care only in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose."

We see no reason why a misrepresentation should not be actionable in negligence, if the necessary elements are present. We agree with the *Restatement* formulation of the relationship and circumstances necessary to give rise to a duty resulting in liability for economic loss alone and conclude that they existed in this case. Defendants' duty not to misrepresent their intentions negligently arises from the context of the parties' dealings and the nature of the information sought by plaintiffs. Arms' length negotiations had concluded; all of the terms of the assignment had been agreed to. However, plaintiffs did not want to sign the agreement unless they were assured that defendants intended to release lots in accordance with the escrow instructions when plaintiffs had paid the $200,000. As parties to the Hatch contract and escrow instructions, defendants were in the best position to know what they intended the documents to mean regarding the release of deeds to individual lots. There was evidence from which the jury could find that defendants represented to plaintiffs that the documents required a release of the deeds on payment of the amounts specified in the escrow instructions.

Also, defendants were the *only* parties with knowledge of their own intentions concerning the release of the deeds on payment of the $200,000. Plaintiffs were completely dependent on them to state their intentions regarding deed releases accurately, so that they could make an informed business judgment whether to execute the modification agreement to purchase the vendees' interest under the contract. It was not merely foreseeable that plaintiffs would rely on defendants' representations. There is evidence that defendants knew that plaintiffs would, in fact, rely on any statement that they made concerning their intentions regarding the release of the lots, that plaintiffs would purchase Compton's interest under the contract only if defendants would release lots as provided in the escrow instructions and that plaintiffs would be required to borrow the $200,000 that defendants demanded

that they pay in order to obtain defendants' consent to the assignment.

Defendants had a pecuniary interest in the transaction and were the only source of information concerning their own intentions; plaintiffs had a right to expect that they would not negligently misrepresent those intentions. There was evidence from which the jury could find that Lawrence Erwin, acting on behalf of defendants and with their authorization, negligently misrepresented defendants' intentions with respect to the release of the deeds and also misrepresented their intentions as to how they would interpret the contract. There was evidence that plaintiffs reasonably relied on those misrepresentations and were damaged in ways that defendants could have reasonably foreseen. The court did not err in submitting the negligent misrepresentation claim to the jury.

The remaining question is whether the court erred in granting a new trial on the ground that the damages instruction on the negligent misrepresentation claim was wrong. The trial court relied on *Restatement (Second) Torts,* § 552, for its conclusion that the misrepresentation was actionable in negligence. It instructed the jury that plaintiffs were entitled to damages for "pecuniary loss suffered as a consequence of the plaintiffs' reliance upon the misrepresentation, that amount doesn't exceed the sum of $658,000.00."

*Restatement (Second) Torts,* § 552B, limits a defendant's liability for negligent misrepresentation to damages

"(1)    * * * necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including

"(a)    the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

"(b)    pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

"(2)    the damages recoverable for negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant."

The trial court apparently concluded that its instruction was

incomplete, because, although it correctly stated that plaintiffs were entitled to damages for their pecuniary loss resulting from defendants' negligence, it did not state that plaintiffs were not entitled to damages for the benefit of their bargain. Although the evidence is sufficient to support the jury's award of damages under the *Restatement* rule, it is possible that the jury might have understood the term "pecuniary loss" to include recovery for the benefit of the bargain,[4] a basis that would not be proper under the *Restatement.*

■· We need not decide, however, whether the instruction was a correct statement of Oregon law, because we conclude that defendants did not preserve the alleged error on which the court based its decision to grant a new trial; accordingly, it was not properly a part of the motion for new trial and could not form the basis for granting the motion. There was much discussion at trial concerning the proper measure of damages; the court appeared to agree with defendants that plaintiffs were not entitled to the benefit of their bargain. Neither plaintiffs nor defendants requested a "cap" on damages. However, when the court set one, defendants' objection to the court's instruction was that any "cap" greater than $200,000 on pecuniary loss would permit the jury to make an award that could include the benefit of the bargain. They did not object to the instruction on the ground that plaintiffs were not entitled to damages for their pecuniary loss; neither did they seek a limiting instruction that the benefit of the bargain was not a proper measure of damages. They objected only to the cap of $658,000.

Contrary to defendants' contention at trial, there was evidence from which the jury could find that plaintiffs' out-of-pocket losses and consequential damages were at least $658,000, so the instruction was not erroneous in the manner argued to the trial court. We conclude, therefore, that defendants' objections to the instruction did not apprise the court of the error now claimed.

---

[4] The benefit of the bargain would appear to be the difference between what plaintiffs paid defendants ($200,000) and the value of the 16 lots plaintiffs claim that they should have received (approximately $658,000). That would be $458,000, less than the jury verdict. Because the jury asked the court how it determined the "cap" of $658,000, it is apparent that the jury awarded plaintiffs as much as the instruction permitted. There is sufficient evidence that plaintiffs' pecuniary damages exceeded the amount that the jury awarded.

Because the alleged error was not preserved, it could not properly form the basis for the motion for new trial, ORCP 64B(6),[5] and the court should not have ordered a new trial, unless it did so on its own motion pursuant to ORCP 64G.[6] There is no indication that the court intended to act on its own motion; the judgment does not so state or contain the other specifications required by ORCP 64G. We conclude that the motion for a new trial should not have been granted. *Maudling v. Clackamas County,* 278 Or 359, 563 P2d 731 (1977). None of the other grounds given for affirming the order granting a new trial has merit.

Plaintiffs also assign error to the court's awarding attorney fees to defendants on plaintiffs' contract claim of breach of the duty of good faith. Although defendants prevailed on the contract claim, in order to recover attorney fees allowed by the contract they must be the prevailing party in the entire action. *Zidell v. Greenway Landing Devel. Co.,* 89 Or App 525, 528, 749 P2d 1210 (1988). On remand, final judgment will be entered for plaintiffs. Therefore, defendants are not the prevailing parties and are not entitled to attorney fees.[7]

On appeal, order granting new trial vacated, jury verdict reinstated and remanded for entry of a judgment for plaintiffs not inconsistent with this opinion; affirmed on cross-appeal.

---

[5] ORCP 64 provides, in part:

"B. A former judgment may be set aside and a new trial granted in an action where there has been a trial by jury on the motion of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:

"* * * * *

"B.(6). Error in law occurring at the trial and objected to or excepted to by the party making the application.

"* * * * *

"D. In all cases of motion for a new trial, the grounds thereof shall be plainly specified, and no cause of new trial not so stated shall be considered or regarded by the court."

[6] ORCP 64G provides:

"If a new trial is granted by the court on its own initiative, the order shall so state and shall be made within 30 days after the entry of the judgment. Such order shall contain a statement setting forth fully the grounds upon which the order was made, which statement shall be a part of the record in the case."

[7] In view of our holding on this issue, we do not address plaintiffs' remaining assignments of error, which are contingent on our affirming the order granting a new trial.