Argued and submitted August 28, 1991, decision of Court of Appeals reversed in part; case remanded to Court of Appeals for further consideration December 31, 1992

ONITA PACIFIC CORPORATION,
an Oregon corporation,
John A. Dante and Jeanine Dante,
husband and wife,
*Respondents on Review,*

*v.*

TRUSTEES OF CHARLES D. BRONSON,
and Warde H. Erwin, Clyde Purcell
and L.A. Swarens,
*Petitioners on Review,*

*and*

Lawrence W. ERWIN,
John Compton, Douglas K. Siebert
and Dorothy L. Siebert, husband and wife,
and Douglas Cascade Corporation,
an Oregon corporation,
*Defendants.*

(CC A8607 04518; CA A46940; SC S37818, S37945)

843 P2d 890

150

James H. Clarke, of Lane Powell Spears Lubersky, Portland, argued the cause and filed the petition for petitioners on review Purcell and Swarens.

Thomas W. Brown, of Cosgrave, Vergeer & Kester, Portland, argued the cause and filed the petition for petitioners on review Erwin and Trustees of Charles D. Bronson.

Lisa E. Lear, of Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, argued the cause and filed the response to the petition for respondents on review. With her on the response were I. Franklin Hunsaker and James G. Driscoll.

Gary M. Berne, Steven D. Larson, and Allen Field, of Stoll, Stoll, Berne & Lokting, Portland; Gary I. Grenley and Michael C. Zusman, Portland; and Henry Kantor, of Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

Michael C. McClinton and Steven M. Lippold, Salem, filed a brief on behalf of *amici curiae* Oregon Association of Defense Counsel and Oregon Association of Realtors.

PETERSON, J.

Fadeley, J., concurred and dissented and filed an opinion.

Unis, J., dissented and filed an opinion.

## PETERSON, J.

This proceeding stems from a dispute regarding the terms of a real estate development agreement. At trial, after the court directed a verdict in favor of defendants[1] on plaintiffs'[2] fraud claim, the jury returned a verdict in favor of plaintiffs on their claim for negligent misrepresentation. The trial court thereafter granted defendants' motion for a new trial on the ground that the jury instruction on damages was erroneous. Plaintiffs appealed, asserting that the trial court erred in granting a new trial, in awarding attorney fees, and in dismissing plaintiffs' other claims for relief. The Court of Appeals reversed. It upheld the verdict on the claim for negligent misrepresentation, vacated the trial court's order granting a new trial, and reinstated the jury's verdict on the ground that the objection to the jury instruction had not been preserved and thus that the trial court erred in granting a new trial. *Onita Pacific Corp. v. Trustees of Bronson*, 104 Or App 696, 709, 711-12, 803 P2d 756 (1990).

On defendants' petitions for review, although we agree that damages may be recoverable for some negligent misrepresentations, a claim for negligent misrepresentation is not made out under the facts present here. Therefore, we reverse the Court of Appeals' decision reinstating the verdict for plaintiffs on their claim for negligent misrepresentation.[3] Because the Court of Appeals did not address plaintiffs' contentions that the trial court erred in directing a verdict on their fraud claim and in dismissing their claim for breach of the implied covenant of good faith, we remand the case to the Court of Appeals for consideration of those issues. The Court

---

[1] In this opinion, unless otherwise noted, when we refer to "defendants," we are referring to defendants Trustees of Charles D. Bronson, and Warde H. Erwin, Clyde Purcell, and L.A. Swarens. There were other defendants in the trial court, but only these four remain in the case on appeal.

[2] In this opinion, unless otherwise noted, when we refer to "plaintiffs," we are also referring to nominal defendants Douglas K. Siebert, Dorothy L. Siebert, and Douglas Cascade Corporation. The Sieberts and Douglas Cascade Corporation were joint venturers with plaintiffs John A. Dante, Jeanine Dante, and Onita Pacific Corporation and were plaintiffs in this action until they assigned their interests in the joint venture to the Dantes and Onita Pacific Corporation.

[3] Our holding that plaintiffs have no actionable claim for negligent misrepresentation renders it unnecessary for us to address whether the Court of Appeals erred in holding that defendants failed to preserve their claim of error regarding the instruction given.

of Appeals also should reconsider its decision concerning attorney fees in the light of its ultimate disposition of the appeal.

In 1973, Betty Camomile entered into a land sale contract (Camomile contract) with defendants to sell three large tracts of real property. The Camomile contract provided for a stream of payments over time to Camomile as the real property was developed and sold. In 1979, defendants sold their rights in two of the three parcels to Robert Hatch by a land sale contract (Hatch contract), which provided that a deed for each lot would be placed in an escrow with instructions for its release on resale. Hatch then assigned his interest to John Compton, with defendants' and Camomile's consent. Subsequently, Compton decided to sell his interest in the two parcels under the Hatch contract.

Plaintiffs were interested in purchasing Compton's interest. Camomile refused to consent to Compton's delegation of his obligations to her under the Hatch and Camomile contracts. In order to eliminate the need for Camomile's consent, plaintiffs agreed to make a payment of $200,000 that would be used by defendants to pay the balance owing to Camomile. Plaintiffs transferred property worth approximately $850,000 to Compton for his interest in the Hatch contract and borrowed $200,000 in cash from Compton to make the $200,000 payment to defendants. Plaintiffs gave Compton a promissory note for $200,000 and security interests in their interest as assignees of the Hatch contract and in other property that they owned.

Defendants, plaintiffs, and Compton negotiated a "Modification of Agreement," pursuant to which the parties agreed to change some of the restrictions on the development of the lots for resale. After setting forth the modifications to the development plan, the Modification of Agreement provided:

"In all other respects the contract between CHARLES D. BRONSON, CLYDE PURCELL, L.A. SWARENS and WARDE H. ERWIN, a joint venture, and ROBERT HATCH and JOHN COMPTON shall remain in full force and effect.

"Vendors-sellers [defendants] hereby consent to sale-assignment by JOHN COMPTON to DOUGLAS K. SIEBERT, and his WIFE, and to DR. and MRS. JOHN

'JACK' A. DANTE, and to the DOUGLAS CASCADE COR-
PORATION and ONITA PACIFIC CORPORATION, as ten-
ants in common, each to be jointly and severally liable and
responsible for performance of the contract above referenced
and herein modified.''

The Hatch contract, to which the Modification of Agreement
referred, included a clause that provided that ''[t]here are no
representations or warranties made by either party except as
contained in this document.'' There is no written memoran-
dum in the record that reflects the details of the sale-
assignment by Compton to plaintiffs.

Plaintiffs contend that they agreed to make the
$200,000 payment because defendants told them that lots
worth $200,000 would be released to them. Specifically, Dou-
glas Siebert testified that Lawrence Erwin, defendants' attor-
ney, had assured him that the $200,000 payment would be
processed through the escrow that held the deeds and that the
escrow would release lots worth $200,000 to plaintiffs.[4]
Siebert testified that he relied on Lawrence Erwin's represen-
tations, because defendant Warde Erwin had told him that
Lawrence Erwin would handle the negotiations on defen-
dants' behalf. Just before the transaction was to close, Law-
rence Erwin informed Siebert that defendants wanted to use
a different escrow to avoid a processing fee and that they
proposed that plaintiffs' payment be processed through Law-
rence Erwin's client trust account. Lawrence Erwin assured
Siebert that the payment would be treated just as it would
have been if processed through the original escrow and that
the new escrow would have the same instructions as the
previous one. Siebert, who believed that the existing escrow
instructions permitted releases of lots without resale, agreed
to this procedure on behalf of plaintiffs.

After making the $200,000 payment and executing
the Modification of Agreement, plaintiffs requested the
release of 16 lots worth $192,000. Defendants refused to
release the 16 lots on the ground that the Hatch contract
required releases of lots only upon resale. Lawrence Erwin
then drafted instructions for the new escrow that clearly

---

[4] The escrow instructions provided for the release of a deed for a lot upon the
escrow's receipt of the lot price. The escrow instructions did not explicitly require a
resale before a lot would be released.

limited releases of lots to third-party resales. Further, in his cover letter accompanying the proposed new escrow instructions, Lawrence Erwin acknowledged that Douglas Siebert may have been confused about the availability of releases of lots without a resale. Without the released lots, plaintiffs had no collateral and were unable to obtain financing to develop the lots for resale, and they defaulted on their obligation to Compton. Compton foreclosed on the security, *i.e.*, plaintiffs' interests as assignees of the Hatch contract and plaintiffs' other property that had been pledged as security for the $200,000 loan.

Plaintiffs brought suit against defendants seeking reformation of the Hatch contract and the Modification of Agreement to provide for the release of lots upon the payment of $200,000 by plaintiffs. Plaintiffs also sought damages for fraud, negligent misrepresentation, breach of the implied covenant of good faith, and intentional interference with contractual relations. The reformation claim was tried to the court first. The trial court denied reformation, stating that plaintiffs had failed to prove that defendants intentionally deceived plaintiffs regarding the release of lots and that Lawrence Erwin was not shown to have authority to bind defendants by his representations. The trial court also dismissed plaintiffs' claims for breach of the implied covenant of good faith and for intentional interference with contract.

Plaintiffs' fraud and negligent misrepresentation claims were then tried to the jury. At the close of plaintiffs' evidence, the trial court granted defendants' motion for directed verdict on the fraud claim. The jury thereafter returned a verdict in favor of plaintiffs on their negligent misrepresentation claim. Defendants moved for judgment notwithstanding the verdict, arguing that Oregon law does not recognize the tort of negligent misrepresentation and, even if it did, that it would not arise in these circumstances. Defendants also moved for a new trial, arguing that, assuming the legal sufficiency of plaintiffs' claim for negligent misrepresentation, the trial court's instruction on damages was incorrect. The trial court denied the motion for judgment notwithstanding the verdict and granted the motion for a new trial, stating that its instruction on damages was incorrect.

Plaintiffs appealed, assigning as error the trial court's granting of the new trial based on the damages instruction, the trial court's award of attorney fees to defendants, the dismissal of plaintiffs' claim for breach of the implied covenant of good faith, and the granting of defendants' motions for directed verdict on plaintiffs' fraud claim. Defendants Purcell and Swarens cross-assigned as error the trial court's denial of their motion for directed verdict on plaintiffs' claim for negligent misrepresentation. Defendants Warde Erwin and Trustees of Charles D. Bronson cross-appealed, assigning as error the trial court's denial of their motion for directed verdict, the trial court's ruling on their issue preclusion defense to the fraud and negligent misrepresentation claims based on the court's findings in the bench trial on the reformation claim, and the denial of their motion for summary judgment on the ground that plaintiffs were not real parties in interest.

The Court of Appeals reversed. Concerning the tort of negligent misrepresentation, the Court of Appeals held that defendants' conduct was actionable and that the jury's verdict was supported by evidence in the record. *Onita Pacific Corp. v. Trustees of Bronson, supra,* 104 Or App at 710. Concerning the order granting a new trial, the Court of Appeals held that defendants "did not preserve the alleged error [in the instructions] on which the [trial] court based its decision to grant a new trial." *Id.* at 711. Therefore, the Court of Appeals reversed that order. The Court of Appeals also reversed the trial court's award of attorney fees to defendants on the ground that, despite the fact that they had prevailed on the contract claim, defendants were not the prevailing parties in the action. *Id.* at 712. The Court of Appeals affirmed the trial court on defendants' assignments of error in the cross-appeal. *Ibid.*

■ Plaintiffs' claim for negligent misrepresentation is based on Restatement (Second) of Torts § 552 (1977).[5] They

---

[5] Restatement (Second) of Torts § 552 provides:

"(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

assert that "a party who supplies false information should be liable for misrepresentations that are made negligently." Defendants contend that, as between parties to an arm's-length transaction, one party should not be held liable to another party for economic losses caused by the latter's reliance on the former's negligent misrepresentations.

In *Duyck v. Tualatin Valley Irrigation Dist.*, 304 Or 151, 157-58, 742 P2d 1176 (1987), this court traced the history of the tort of negligent misrepresentation.

> "In England, though the English courts had long recognized the forms of action of deceit and negligence, the House of Lords, in 1889, held that an action for deceit could not be maintained by a plaintiff who had been induced to enter into a disfavorable commercial or financial venture unless the false statement upon which the plaintiff relied was made '(1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false.' *Derry v. Peek*, 14 App Cas 337, 374 (1889). According to Prosser, the English rule was that, 'in the absence of some fiduciary relation between the parties, there was no remedy for merely negligent misrepresentation, honestly believed, where the harm that resulted to the plaintiff was only pecuniary loss,' Prosser, *Misrepresentations and Third Parties*, 19 Vand L Rev 231, 234 (1966) (footnote omitted).
>
> "The best known statement for not recognizing liability for economic loss arising from a negligent misrepresentation causing only economic loss appears in *Ultramares v. Touche*, 225 NY 170, 174 NE 441, 74 ALR 1139 (1931). In that case the New York Court of Appeals, fearing limitless liability, refused to hold an accounting firm liable for negligently certifying a firm's balance sheet. The claimants were third persons who had suffered economic losses in reliance thereon. Judge Cardozo, for the court, stated:

"(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

"(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

"(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

"(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them."

" 'If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a *liability in an indeterminate amount for an indeterminate time to an indeterminate class*. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences.'

"*Id.* at 179-80 (emphasis added).

"The *Ultramares* court distinguished an earlier New York case, *Glanzer v. Shepard*, 233 NY 236, 135 NE 275, 23 ALR 1425 (1922), in which a public weigher of beans was held liable to a buyer for an erroneous weight statement — even though the weighing was at the seller's request — because the weigher knew that the buyer would rely on the weight statement. The *Ultramares* court distinguished *Glanzer* on the ground that the weight statement was 'primarily' for the benefit of the buyer, while the audit statement in *Ultramares* was 'incidently' for the use of third parties.

"Today many American courts recognize the tort of negligent misrepresentation, but the scope of recovery for economic loss varies widely. The New York courts limit recovery to cases in which the nexus between the parties is direct or close. *Credit Alliance Corp. v. Arthur Anderson & Co.*, 65 NY2d 536, 551, 493 NYS2d 435, 483 NE2d 110 (1985) ('there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or party's reliance'). At the other extreme is the view that liability is only limited by the principle of reasonable foresight. *See Craig*, Negligent Misstatements, Negligent Acts and Economic Loss, 92 Law Q Rev 213 (1976). The Restatement (Second) appears to take an intermediate position."

Because the *Duyck* court held that the statute of limitations had run, it was not necessary to decide whether the tort of negligent misrepresentation existed in Oregon; the court simply assumed the existence of the tort. *Id.* at 156, 164. The court concluded that an action for negligent misrepresentation was an action for negligence rather than deceit and, thus, that the plaintiffs' action accrued on the date that they knew or should have known that their reliance on the defendant's representations had caused them a pecuniary loss rather than on the date on which they learned of the defendant's culpability for causing that loss. *Id.* at 160-64.

We now state that, under some circumstances, one may be liable for economic loss sustained by others who rely on one's representations negligently made. In *Duyck, id.* at 158, this court observed that "many American courts recognize the tort of negligent misrepresentation, but the scope of recovery for economic loss varies widely." The rule stated in Restatement (Second) of Torts § 552 (*see* note 5, *ante*) is close to the mark. But, for the reasons that follow, rather than adopting a black letter "rule," we opt to develop the scope of the duty and the scope of recovery on a case-by-case basis, in the light of related decisions of this court.

■■ Our precedents establish that a negligence claim for the recovery of economic losses[6] caused by another must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm. *Hale v. Groce*, 304 Or 281, 284, 744 P2d 1289 (1987), states:

> "[O]ne ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property. It does not suffice that the harm is a foreseeable consequence of negligent conduct that may make one liable to someone else, for instance to a client. Some source of a duty outside the common law of negligence is required." (Citations omitted.)

Hence, where the recovery of economic losses is sought on a theory of negligence, the concept of duty as a limiting principle takes on a greater importance than it does with regard to the recovery of damages for personal injury or property damage.[7]

---

[6] In this opinion we use the term "economic losses" to describe financial losses such as indebtedness incurred and return of monies paid, as distinguished from damages for injury to person or property. *See Ore-Ida Foods v. Indian Head*, 290 Or 909, 627 P2d 469 (1981) (denying employer's economic loss claim against third person who caused employer to become liable for workers' compensation benefits).

[7] *Hale v. Groce*, 304 Or 281, 283, 744 P2d 1989 (1987), held that an omitted intended beneficiary of a deceased testator could assert a negligence claim against an attorney who negligently failed to include an intended bequest when drafting the decedent's will. The plaintiff was both an intended beneficiary of the decedent in his will and "a classic 'intended' third-party beneficiary of the lawyer's promise to his client." *Id.* at 286. Thus, the lawyer's duty extended to the plaintiff as well as to his client. *Ibid.* That duty — to exercise reasonable care in implementing the decedent's testamentary directions — arose from his contractual/professional relationship with the decedent. *Id.* at 284, 286-88. The court also stated that "[o]ne ordinarily is not

Having recognized the existence of the tort, the central question in the present case becomes whether, during the parties' arm's-length negotiations, in addition to a duty of honesty, defendants owed plaintiffs a duty to exercise reasonable care in communicating factual information to prevent economic losses to plaintiffs. To resolve this, we examine the nature of the parties' relationship and compare that relationship to other relationships in which the law imposes a duty on parties to conduct themselves reasonably, so as to protect the other parties to the relationship.

■■ The law imposes a duty of care in the attorney-client relationship. *Chocktoot v. Smith*, 280 Or 567, 570, 571 P2d 1255 (1977); *Harding v. Bell*, 265 Or 202, 204-05, 508 P2d 216 (1973). That duty — to act as a reasonably competent attorney in protecting and defending the interests of the client — is owed not only to the client but, as well, to those who may be considered intended beneficiaries of the duty to the client. *See, e.g., Hale v. Groce, supra*, 304 Or at 284, 287 (extending attorney's duty to intended beneficiary of attorney's promise to the client). If the professional breaches that duty, the client and the intended beneficiary can recover economic losses. Unlike parties who are negotiating at arm's length, the attorney is engaged by the client to use his or her expertise for the benefit and protection of the client's interests. The attorney generally does not and should not have any pecuniary interest that is adverse to the client. *Schroeder v. Schaefer*, 258 Or 444, 450-51, 477 P2d 720 (1970), *modified* 258 Or 444, 483 P2d 818 (1971); *see also* Oregon State Bar, Code of Professional Responsibility, DR 5-101 (Conflict of Interest: Lawyer's Self-Interest). The tort duty to exercise reasonable care in protecting the client's economic interests is implied by law when the attorney contracts with the client to provide legal services. *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 106, 831 P2d 7 (1992).

■■ Other professional or contractual relationships may also give rise to a tort duty to exercise reasonable care on behalf of another's interests. *Cf. Securities-Intermountain v. Sunset Fuel*, 289 Or 243, 259, 611 P2d 1158 (1980) (in "an

---

liable for negligently causing a stranger's purely economic loss without injuring his person or property." *Id.* at 284.

action for damages against one engaged to provide professional or other independent services," the statute of limitations for negligence rather than for contract actions applies "[i]f the alleged contract merely incorporates by reference or by implication a general standard of skill and care independent of the contract, and the alleged breach would also be a breach of this noncontractual duty").[8] Engineers and architects are among those who may be subject to liability to those who employ (or are the intended beneficiaries of) their services and who suffer losses caused by professional negligence. *Ashley v. Fletcher*, 275 Or 405, 550 P2d 1385 (1976) (architect); *Bales for Food v. Poole*, 246 Or 253, 256, 424 P2d 892 (1967) (engineer).

Other examples may be cited. An agent owes duties of care and loyalty to his or her principal. *Lindland v. United Business Investments*, 298 Or 318, 324, 693 P2d 20 (1984) (distinguishing between the duties of loyalty and care owed by an agent to a principal); *Becker v. Capwell*, 270 Or 200, 203, 527 P2d 120 (1974) (real estate broker owes duty to principal such that he must not make secret profit at principal's expense). A primary insurer has a duty to excess insurers and to the insured to exercise reasonable care in attempting to settle third-party claims within policy limits. *Maine Bonding v. Centennial Ins. Co.*, 298 Or 514, 518-19, 523, 693 P2d 1296 (1985).

In the above relationships, the professional who owes a duty of care is, at least in part, acting to further the economic interests of the "client," the person owed the duty of care. In contrast, the present case involves two adversarial parties negotiating at arm's length to further their own economic interests.

The foregoing authorities are the most analogous ones that we can find to the present case. From them, we conclude that, in arm's-length negotiations, economic losses

---

[8] In *Securities-Intermountain v. Sunset Fuel*, 289 Or 243, 258-59, 611 P2d 1158 (1980), this court distinguished between claims premised on breach of a general standard of care and claims alleging specific breach of contractually adopted standards. Because the claims against the defendants, an architect and an engineer, were of the latter type, the applicable statute of limitations was that for contract actions. *Id.* at 262, 263-64.

arising from a negligent misrepresentation are not actionable. This conclusion is in accord with the opinions of some commentators. Professors Harper, James, and Gray have noted the desirability of limiting the class of persons to whom the duty of care is owed in the context of negligent misrepresentations causing economic losses.

"On the whole, as indicated above, courts have provided a remedy for negligent misrepresentation principally against those who advise in an essentially nonadversarial capacity. As against sellers and other presumed antagonists, on the other hand, the tendency of most courts has instead been either to rely on deceit with the requirement of scienter, however expanded, or to shift (by analogy to restitution or warranty) to strict liability * * *." 2 Harper, James & Gray, The Law of Torts 412-13, § 7.6 (2d ed 1986).

Similarly, Professor Alfred Hill distinguishes between misrepresentations made by an adversary in a sales transaction and by one who holds out to the general public that he or she supplies information and has noted:

"The situation is different in the case of 'antagonists.' When the aggrieved person is a buyer, who does not complain of the negligent performance of a service but rather of misrepresentation by a seller inducing the making of a contract, the conceptual mold has been different from the inception of modern contract law: the options have been to sue on the contract or to sue in deceit, without a middle ground consisting of actionable negligence." Hill, *Damages for Innocent Misrepresentation*, 73 Colum L Rev 679, 688 (1973).

Hill also states that allowing recovery for negligent misrepresentations made in the bargaining process would undermine the law of contracts, especially rules of law concerning written contracts. *Id.* at 717-18.

■ Other rules of law suggest the same result. The parol evidence rule, ORS 41.740, and the statute of frauds, ORS 41.580, are substantive rules of contract law that promote commercial certainty by allowing contracting parties to rely on the ultimate written expression of their agreement as embodying the terms of their agreement. *Hatley v. Stafford*, 284 Or 523, 530, 588 P2d 603 (1978). Plaintiffs could have avoided the problems that gave rise to this case by insisting that the lot-release provisions be included in the written

agreements. Arguably, permitting damages for negligent misrepresentation in arm's-length transactions would encourage contracting parties *not* to draft complete, integrated contracts. *See First Equity Corp. of Florida v. Standard and Poor's Corp.*, 869 F2d 175, 180 (2d Cir 1989) (Company in business of providing securities information to others held not liable for negligently misrepresenting security information. "[A] user is in the best position to weigh the danger of inaccuracy and potential loss arising from a particular use of a summary against the cost of verifying the summary by examination of the original documents or [federally required] prospectus.") Recognition of the tort of negligent misrepresentation in a case such as this, in which parties in a bargaining transaction contemplate a later written agreement, would undermine fundamental principles of contract law.

On the other hand, Prosser and Keeton argue that "there would seem to be very little justification for not extending liability to all parties and agents to a bargaining transaction for making misrepresentations negligently." Prosser & Keeton, Torts 745, § 107 (5th ed 1984).[9] However, they do not explain or support that assertion; they merely state it.[10] Prosser and Keeton do acknowledge that most courts have restricted liability for negligent misrepresentations causing pecuniary losses by "limit[ing] the group of persons to whom the defendant may be liable, short of the foreseeability of possible harm." *Ibid.* Further, the situations

---

[9] *See also* Carpenter, *Responsibility For Intentional, Negligent and Innocent Misrepresentation*, 9 Or L Rev 413 (1930). Carpenter argues that an action for negligent misrepresentation should be allowed on the analogy of negligent turning over of a chattel. *Id.* at 421-23, 436. He asserts that a defendant who provided information in the course of his or her business or for profit should be liable for negligent misrepresentation of facts upon which the plaintiff relied, just as a defendant who provided a chattel in the course of his or her business or for profit would be liable for negligent failure to discover defects in the chattel causing injury to the plaintiff. *Id.* at 422. Under Carpenter's proposed rule, no distinction would be made between tangible personal injury and property damage on the one hand and intangible economic losses on the other.

[10] Prosser and Keeton assert that many courts have extended liability to innocent and negligent misrepresenters by inferring dishonesty from the fact that a reasonable person would have known better and, "[t]hus, there may not be so very much practical difference between those jurisdictions where dishonesty is required and those where negligence as well as dishonesty will suffice for recovery." Prosser & Keeton, Torts 746, § 107 (5th ed 1984). That may be true elsewhere, but it is not the law in Oregon. *See Duyck v. Tualatin Valley Irrigation Dist.*, 304 Or 151, 158, 742 P2d 1176 (1987) (distinguishing between deceit and negligence).

that they describe involve suppliers of information, as distinct from parties in bargaining transactions, and the liability of the information suppliers is premised on the existence of a special relationship or by application of third-party beneficiary principles. *Id.* at 746-47.

Our conclusion also is consistent with Restatement (Second) of Torts § 552. The text of section 552 and the comments and illustrations thereto suggest that the editors, in using the words "[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions," had in mind relationships other than the relationship between persons negotiating at arm's length. The comments provide no illustrations dealing with business adversaries in the commercial sense. This was also the conclusion of the Oregon Court of Appeals in *Western Energy, Inc. v. Georgia-Pacific*, 55 Or App 138, 637 P2d 223 (1981). There, in applying Louisiana law, the Court of Appeals stated that section 552 did not encompass claims between parties to arm's-length business transactions. The court stated:

"The extensive comments to § 552 and the illustrations deal with those acting in a professional capacity or those with some special expertise upon which the recipient of the information is specially relying. We find no illustrations dealing with business 'adversaries' in the commercial sense. Some commentators, notably Hill, *Damages for Innocent Misrepresentation*, 73 Colum L Rev 679 (1973), and James and Gray, *Misrepresentation - Part I*, 37 Md L Rev 286 (1977), indicate that § 552 limits liability to situations involving a fiduciary duty or where one gives special or professional advice and does not ordinarily apply to situations involving business adversaries. Hill, *supra*, at 686-88[,] and James and Gray, *supra*, at 313. * * *

"Plaintiff cites Prosser, *Law of Torts*, 706-07 (4th ed 1971), to support the argument that negligent misrepresentation should be actionable between adversaries in a commercial setting. Prosser's example concerns a professional dispensing advice and not a business adversary in contract negotiations. *See* Hill, *supra*, at 686-87, n 24, which points

out the flaw in the Prosser reasoning."[11] 55 Or App at 144 n 6 (emphasis in original).

■    ·    We read Restatement section 552 as consistent with the rule that this court has adopted for negligence actions for the recovery of economic losses, *viz.*, nongratuitous suppliers of information owe a duty to their clients or employers or to intended third-party beneficiaries of their contractual, professional, or employment relationship to exercise reasonable care to avoid misrepresenting facts. See cases discussed *ante* at 160-61. In the case at bar, defendants and their representative did not owe any duty to plaintiffs during the negotiations by virtue of a contractual, professional, or employment relationship or as a result of any fiduciary or similar relationship implied in the law. Here, the relationship was adversarial. In an arm's-length negotiation, a negligent misrepresentation is not actionable. Hence, plaintiffs cannot maintain their claim for negligent misrepresentation against defendants.

■    We recognize that some jurisdictions allow damages for negligent misrepresentation in contexts similar to the case at bar.[12] However, those jurisdictions either treat the tort as a specie of fraud or are more willing to imply a "duty" than our precedents permit. Foreseeability alone is not a sufficient basis to permit the recovery of economic losses on a theory of negligence. *Hale v. Groce, supra,* 304 Or at 284.[13]

---

[11] Professor Hill argues that the fourth edition of Prosser's treatise on torts is somewhat misleading in characterizing the state of the law with regard to negligent misrepresentation. Hill, *Damages for Innocent Misrepresentation,* 73 Colum L Rev 679, 688-87 n 24 (1973). Specifically, Professor Hill notes that Prosser did not distinguish between negligence as a basis for liability against business adversaries as opposed to suppliers of information and that only one case cited by Prosser, a 1925 New Hampshire case, supported a negligence theory by a buyer against a seller. *Ibid.*

[12] *See, e.g., Martens Chevrolet v. Seney,* 292 Md 328, 439 A2d 534 (1982) (finding duty to avoid negligent misrepresentations in arm's-length negotiations); *Wagner v. Cutler,* 757 P2d 779 (Mont 1988) (seller may be liable for reasonably discoverable, but unknown, latent defects when seller represents that item is free of defects); *Formento v. Encanto Business Park,* 744 P2d 22 (Ariz App 1987) (rejecting parol evidence rule rationale as overridden by policy of fostering honesty and fair dealing in transactions; treating negligent misrepresentation like fraud). Unlike those jurisdictions, we believe that the essence of the claim is negligence rather than deceit. *Duyck v. Tualatin Valley Irrigation Dist.,* 304 Or 151, 160, 742 P2d 1176 (1987).

[13] *Fazzolari v. Portland School Dist. No. 1J,* 303 Or 1, 10, 17, 734 P2d 1326 (1987), does not dictate a different result. True, the court there noted that,

"unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability

Plaintiffs cannot maintain their action for defendants' allegedly negligent nonfraudulent misrepresentations, and the Court of Appeals' decision reinstating the verdict is reversed. Because the Court of Appeals did not address plaintiffs' contentions on appeal that the trial court improperly directed a verdict on their fraud claim and improperly dismissed their claim for breach of the implied covenant of good faith, we remand this case to the Court of Appeals for consideration of those unresolved issues and for reconsideration of its decision concerning attorney fees in the light of its ultimate disposition of the appeal.

The decision of the Court of Appeals reinstating the verdict is reversed, and the case is remanded to the Court of Appeals for further consideration consistent with this opinion.

**FADELEY, J.,** concurring and dissenting.

This is a misrepresentation case. As a jury found, the Erwin joint venture (Erwin) represented to the Dante joint venture (Dante) that a large number of lots in the Wildhorse real estate development would be released to Dante when Dante paid $200,000 to the benefit of Erwin. Acting in reliance on that representation, Dante (also called "Onita" by the majority) borrowed and paid the $200,000 to Erwin's benefit.[1] Dante also paid $850,000 worth of real estate for the

---

for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest *of the kind of harm that befell the plaintiff." Id.* at 17.

However, *Fazzolari* recognized that the common law of negligence traditionally has excluded some types of "predictable" harms from its reach, including "solely economic * * * injuries," *id.* at 7, which are the essence of plaintiffs' claims herein. *See also Hale v. Groce, supra* note 6, 304 Or at 284 (decided after *Fazzolari*; distinguishing between negligence claims for economic losses and those for personal injury or property damage); *Norwest v. Presbyterian Intercommunity Hosp.*, 293 Or 543, 561, 652 P2d 318 (1982) (denying recovery to child for *foreseeable* damages sustained as a result of mother's bodily injury, in part because general negligence law in Oregon does not recognize the recovery of damages for psychic injuries suffered by one not directly injured by the negligent conduct).

[1] Although Erwin had signed a written promise to not arbitrarily withhold consent to assignment, Erwin demanded that $200,000 be paid as a condition of Erwin's consent that its buyer, one Compton, could assign the buyer's interest in Wildhorse Plains and Meadows to Dante. The majority inaccurately states that Mrs. Camomile, who originally sold to Erwin, made the demand. The parties' pleadings

buyer's interest under a land sale contract covering Wildhorse Meadows and Plains.

But Erwin refused to release the lots. After the money was paid, Erwin unilaterally took actions that prevented the lot release as follows:

(1) terminated the existing escrow and changed escrow companies; and

(2) issued written escrow instructions that contained a new condition that Erwin knew would thwart release of any lots to Dante.[2]

Because the lots were not released, Dante failed, losing its cash and real property already paid, and also its interest in Wildhorse. Dante filed a complaint claiming both fraud and negligent misrepresentation.

The trial judge removed the fraud claim from the jury but submitted Dante's negligent misrepresentation claim against Erwin. The jury returned its verdict for Dante and against Erwin in a substantial amount of economic damages. The trial judge set it aside, giving as his reason one of his instructions concerning the measure of damages. The Court of Appeals reinstated the verdict.

On review in this court, the majority holds that there is a tort of negligent misrepresentation in Oregon. I concur. But, the majority then create a new rule of law to prevent recovery by a party to any usual business transaction, notwithstanding that the party acted in reliance on a negligent misrepresentation of the other party to the transaction. Based on that rule, the majority overthrows the jury verdict. I dissent.

The majority's newly created rule of law is based on the proposition that:

---

show that Erwin made the demand and that it led to the lot-release misrepresentation.

[2] After the thwarting condition was in place, Erwin wrote a letter to Dante and others that excused Erwin's refusal to permit the release of the lots by stating that Erwin's lawyer (Larry Erwin) "hadn't read the contract" before making the representation that the lots would be released.

> **A business person in Oregon owes no legal duty of care to accurately represent the material facts of a commercial transaction to another business person during arm's-length negotiations related to that transaction. There is no legal duty, even though the first knows that the second will rely on the facts represented when entering into that transaction. There is no legal duty, even though the first has a substantial pecuniary interest in persuading the second to enter into the transaction.**

I disagree with that proposition and the newly created commercial policy that it represents. It is my view of the law that, when the negligent falsifier intends reliance by another who risks and loses economically because of that intended reliance, the risk of loss caused by negligently misrepresenting important information should not be shifted from the falsifier to the one who relies on the misrepresentation. It most certainly should not be shifted where, as here, the falsifier obtains and keeps a substantial economic benefit that was received, at least in part, as a result of disseminating the false information. Shifting the risk of loss from the misrepresenter, who stands to gain from the misrepresentation, onto those who are intended to and do rely on the misrepresentation will have profound effects on the moral and commercial fabric of our culture.

In contrast to the majority's proposition, Restatement (Second) of Torts, § 552(1) (1977), states the law to be that:

"One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

A few more facts are in order before turning to the majority's discussion of "authorities" on which it relies for this new rule. Defendants Erwin, et al (Erwin), a joint venture, bought three parcels of land on contract from Camomile. Erwin then sold two of the three parcels (Wildhorse Plains and Wildhorse Meadows) on a separate land sale

contract to Hatch who, with consent, assigned to Compton. The contract between Erwin, as seller, and Hatch, and Hatch's assignee Compton, as buyer — from whom Dante bought by assignment — called for lot releases under separate escrow instructions.

In a letter from Larry Erwin dated, April 25, 1981, responding to questions asked by Dante, the following representations were made about the release of lots upon payment of incremental sums:

"Her [Camomile's] escrow instructions as to Wildhorse Meadows and the flood plain are to deliver each of the 35 deeds [text of footnote: upon direction of Hatch or his assignee] to the joint venture or as directed by them when certain sums are received by the escrow company for delivery to her. The flood plain deed is not to be delivered until the Camomile contract is paid in full.

"There were 41 deeds delivered in escrow as to Wildhorse Plains with instructions to deliver the deeds to or as directed by the joint venture under the same escrow instructions and on the same terms as applied to Wildhorse Meadows.

"In turn, the joint venture [Erwin] delivered escrow instructions to the same escrow agent in regard to the same deeds to deliver each as directed by Hatch to prospective purchasers upon payment of $12,000. for all parcels east of Camp Polk Road and $18,000. for all parcels west of Camp Polk Road, and to pay to Betty Camomile the amounts required under her escrow instructions for release of the applicable deed [$4,000 or $7,000 per lot] and to remit the balance to the joint venture.

"A * * * deed therefore will go directly from Betty Camomile (the record titleholder) * * * *to Hatch* (or his assignee) [*i.e.*, plaintiffs Dante] *when Hatch has paid the required $12,000. or $18,000.*, and Hatch (or his assignee) could, of course, sell the property for whatever price desired." (Emphasis added.)

As can be seen, the representation clearly states that the deeds already in escrow would go directly to Hatch's assignee "when Hatch has paid the required $12,000. or $18,000. [per lot]." Erwin's escrow instructions, referred to above, provided for delivery of deeds to Hatch or his order (*i.e.*, to Compton or Compton's assignee, Dante) in the following terms:

"Thirty-five deeds for numbered parcels of real property located in Deschutes County, Oregon, and identified as Wild Horse Meadows have been delivered to * * * as escrow agent, along with instructions from Betty Camomile as grantor to deliver said deeds to the undersigned or their order upon receiving $4,000. for each parcel lying east of Camp Polk Road and $7,000. for each parcel lying west of Camp Polk Road, and to deliver and release all deeds to the undersigned when said agent has in its possession satisfactory evidence that the undersigned's obligation for payment under a contract with Betty Camomile, dated March 31, 1973 has been satisfied in full.

"You are authorized to accept each of said deeds in behalf of the undersigned and to hold the same *for delivery to Robert A. Hatch or his order*[3] when you have in your possession for delivery to the undersigned, the sum of $12,000. for each of said parcels lying east of the Camp Polk Road and $18,000. for each of said parcels lying west of Camp Polk Road." (Emphasis added.)

On the strength of this document and the other representations that lots would be released to Dante when $12,000 for some lots or $18,000 for the better lots was paid, Dante paid $200,000, which was distributed as Erwin directed.

After the lot-release representation was made and after the money was paid and received, Erwin, Compton, and Dante entered into a "Modification of Agreement" that provided as follows:

"It is further agreed that [Erwin's] deeds leaving a space for Grantee in blank conveying each lot in said subdivision as platted shall be placed in escrow conveying title to said lots in place of deeds now in escrow [from Camomile and from Erwin] which shall be canceled and deeds for lots 9, 10, 11, 12, and 13, Block 8, shall be subject to an easement to be described and subject to a restriction concerning the construction of dams or restrictions in or of Squaw Creek.

"In all other respects the contract between CHARLES D. BRONSON, CLYDE PURCELL, L. A. SWARENS and WARDE H. ERWIN, a joint venture, and ROBERT HATCH and JOHN COMPTON shall remain in full force and effect.

---

3 Hatch was designated as "Purchaser" in the contract whereby Erwin sold the two parcels to Hatch "or" his assignees.

"Vendors-sellers hereby consent to sale-assignment by JOHN COMPTON to DOUGLAS K. SIEBERT, and his WIFE, and to DR. and MRS. JOHN 'JACK' A. DANTE, and to the DOUGLAS CASCADE CORPORATION and ONITA PACIFIC CORPORATION, as tenants in common, each to be jointly and severally liable and responsible for performance of the contract above referenced as herein modified."

Although the Modification of Agreement did not call for a new escrow or new instructions, Erwin, acting unilaterally, restructured the entire escrow, as reported earlier in this opinion.

I believe that on the foregoing facts the Restatement formulation coincides with the law of Oregon on the subject of negligent misrepresentation. Restatement (Second) of Torts 126-27, § 552, states:

"(1)   One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"(2)   Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

"* * * * *

"(b)   through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends * * *."

Comment *a* to section 552, at 128, states:

"Rather, one who relies upon information in connection with a commercial transaction may reasonably expect to hold the maker to a duty of care * * * in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose."

Defendants were manifestly aware of the use to which the information would be put. They intended to supply it for that purpose, as an inducement to plaintiffs to risk their economic interests on the success of the transaction. The transaction would have succeeded for all parties had the

representation held up. That section states the proper law for Oregon and its commercial future.

But the majority has a different view — that arm's-length negotiations and the fear of limitless liability excuse the misrepresentations and prevent any liability for harm suffered by reliance on the misrepresentations. The rationales offered for the majority's result are founded on two different assumptions of fact that cannot logically exist together because the assumptions are mutually exclusive. One requires that the plaintiff be a party to the transaction who negotiated at arm's length with the defendant when the misrepresentation was made; the other requires that the plaintiff be so much a stranger to the transaction that the misrepresented information was not intended or expected to be for his or her use.

First, it is said by the majority that "arms-length negotiations" prevent liability. That assumes that the party who disseminates the negligently inaccurate information and the party who relies on it were, at the time, negotiating a business transaction with each other. Such *is* factually this case.

Second, it is said that liability should not be extended to any persons who were "strangers" to the transaction in which the misrepresentation was uttered. Based on concern that liability should not extend to strangers, courts of other states, " 'fearing limitless liability,' " have held that no liability exists to those *not a party to the transaction* or expressly intended to be affected by it because, otherwise, " 'liability in an indeterminate amount for an indeterminate time to an indeterminate class' " would arise. 315 Or at 158. The second rationale — avoiding limitless liability to a limitless class — appealing though it may be, simply does not apply to this case. Here buyer seeks to hold seller responsible for the losses buyer incurred because information that seller gave directly to buyer, intending to induce buyer to pay $200,000 to sellers' benefit, was negligently false. There are no "strangers"[4] to the transaction — no limitless class — here.[5]

---

[4] *Hale v. Groce*, 304 Or 281, 284, 744 P2d 1289 (1987) ("one ordinarily is not liable for negligently causing a stranger's purely economic loss").

[5] Accordingly, *none*, repeat, none, of the Oregon case decisions cited, nor the New York decisional law, apply to this case. They are about liability to strangers to

The majority first indicates that the rule in Restatement (Second) of Torts § 552 is "close to the mark." 315 Or at 159. But the majority would deny the remedy of an action for negligent misrepresentation to a party who had dealt with the defendant in an arm's-length transaction. This modification of the Restatement is unwarranted and unsupported by the authority cited in the majority opinion itself. The crucial distinction is not whether a transaction is at "arm's length" — a distinction not found in § 552 — but rather whether the defendant knew that the plaintiff was the recipient of the information and would rely on it. Here defendants uttered the inaccurate representation to plaintiffs intending plaintiffs to rely, rather than plaintiffs being simply an unknown, but "foreseeable," injured party.[6] As § 552(2) puts it, liability for negligent misrepresentation is "limited to loss suffered * * * by the person or one of the limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it."

The majority states that § 552 and its comments and illustrations "suggest" that it does not apply to parties engaged in an arm's-length transaction.[7] 315 Or at 164. On

the transaction. Moreover, the New York authority cited by the majority has been modified in its state of origin, *Credit Alliance Corp. v. Arthur Anderson & Co.*, 65 NY2d 536, 551, 493 NYS2d 435, 483 NE2d 110 (1985) (recovery is permitted where the nexus between the parties is direct or close); *Ossinging School v. Anderson*, 73 NY2d 417, 425, 541 NYS2d 335, 539 NE2d 91 (1989) (declaring the test for misrepresentation liability to be "(1) awareness that the reports were to be used for a particular purpose or purposes; (2) reliance by a known party or parties in furtherance of that purpose; and (3) some conduct by the defendants linking them to the party or parties and evincing defendant's understanding of their reliance"). This test does not incorporate as any factor in the decision whether the encounter is at arm's length. These later cases support recovery here.

[6] While I agree with my brother, Unis, J., that "the majority incorrectly" denies liability as a matter of law under the facts of this case, I find no reason present here to announce a rule of liability for negligent misrepresentation that "extends to include all reasonably foreseeable plaintiffs." 315 Or at 180 (Unis, J., dissenting). Here there is no need to "extend" the utterer's liability beyond the direct and intended recipient of the misrepresentation, made by one who receives a benefit from the other's reliance on it.

[7] It is true that some commentators and courts have suggested this limitation. The majority opinion criticizes as unsupported Prosser and Keeton's assertion that there is little justification for denying parties in an arm's-length transaction the benefit of a remedy for negligent misrepresentation. 315 Or at 163. However, the source of the "unsupported" suggestion is a quote by Professor Arthur Hill in a brief discussion of negligent misrepresentation contained in his article on innocent

the contrary, the language of § 552 explicitly applies to the situation in the present case; negligent misrepresentation applies to:

> "One who, in the course of his business, profession or employment, *or in any other transaction in which he has a pecuniary interest*, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Emphasis added.)

The commentary and illustrations definitely do not "suggest" that an arm's-length transaction is exempt. One comment to § 552 speaks of the ability of one who has contracted for the information to "elect" between a contract and a

---

misrepresentation; it is far from a comprehensive analysis. Hill, *Damages for Innocent Misrepresentation*, 73 Colum L Rev 679, 685-88 (1973). Besides, Hill's major premise — that no additional state appellate courts have adopted a cause of action for negligent misrepresentation made in an arm's-length business negotiation since Restatement § 552 was first promulgated — is not currently accurate. *E.g.*, Restatement in the Courts 835-36 (1976 Supp); *id.* at 502-03 (1974-75 Supp); *id.* at 397-98 (1972-73 Supp), and see *infra* at 176, text citing appellate decisions from other western states herein.

The majority also quotes the following by Professors Harper, James, and Gray:

> "On the whole, as indicated above, courts have provided a remedy for negligent misrepresentation principally against those who advise in an essentially nonadversarial capacity * * *. As against sellers and other presumed antagonists, on the other hand, the tendency of most courts has instead been either to rely on deceit with the requirement of scienter, *however expanded*, or to shift (by analogy to restitution or warranty) to strict liability * * *." 315 Or at 162 (footnotes omitted; emphasis added) (quoting 2 Harper, James & Gray, The Law of Torts 412-13, § 7.6 (2d ed 1986).

This does not discuss the "desirability" of the arm's-length rule, as is stated in the majority, but instead, merely describes the "tendency of most courts." *Ibid.* Also, the part of the quotation that states that most courts rely on strict liability or "deceit with its requirement of scienter, *however expanded*," indicates that a remedy for the negligent misrepresentation may be available, whatever label is applied to the remedy. *Ibid.* Further discussion of the true position of this treatise occurs in the text *post* at 177.

Others have questioned any interpretation of the Restatement (Second) of Torts § 552 which excludes liability for parties arm's-length transactions. *See* Note, *Balancing the Buyer's Right to Recover for Precontractual Misstatement and the Seller's Ability to Disclaim Express Warranties*, 76 Minn L Rev 1189, 1203 n 61 (1992) (Illinois' interpretation of the Restatement as barring arm's-length transactions is "extremely narrow[]"); Comment, *Examining Restraints on Freedom to Contract as an Approach to Purchase Dissatisfaction in the Computer Industry*, 74 Calif L Rev 2101, 2112 (1986) (Expressing some disbelief that some courts dispute whether the Restatement (Second) of Torts § 552 applies in a contract setting).

negligent misrepresentation remedy. This indicates that the negligent misrepresentation remedy is available between arm's-length contracting parties. Restatement (Second) of Torts § 552, comment *g* at 132 (1977).

Even more apt to upholding liability in the present case is illustration 4 from comment *h*, which provides:

> "A, having lots for sale, negligently supplies misinformation concerning the lots to a real estate board, for the purpose of having the information incorporated in the board's multiple listing of available lots, which is distributed by the board to approximately 1,000 prospective purchasers of land each month. The listing is sent by the board to B, and in reliance upon the misinformation B purchases one of A's lots and in consequence suffers pecuniary loss. A is subject to liability to B." *Id.* at 134.

In analyzing this illustration, it first must be noted that promulgation of A's misrepresentation by the middleman "real estate board" is not present in our case where A told B directly and B relied on the misrepresentation. It is not the "real estate board," but A, who is being held liable for negligent misrepresentation in the Restatement example. There is no indication that A and B are anything other than arm's-length negotiators on a contract for the sale of land. This illustrative case is very similar to the situation at issue in this case. Here, the jury found that defendants negligently supplied incorrect information to plaintiffs while they were negotiating a contract for the sale of an interest in land. Section 552, cited by the majority, has no arm's-length exception to liability.

Nor does any norm of business practices or ethics currently extant in Oregon support the exclusion from recovery announced by the majority. In the Oregon business norm, each party to a transaction takes care to not negligently mislead or misrepresent to another party who will rely on the representation. The norm involving real property has been stated in *Leach v. Helm*, 114 Or 405, 412, 235 P 687 (1925). There, the defendants misrepresented to the plaintiff which parcel of land was for sale. Before upholding a jury verdict that stated that the defendant was "guilty of misrepresentations," the court said:

"The fact, if it be a fact, that defendant was honestly mistaken in the matter of locating plaintiff is immaterial. Defendant had reason to believe that his representations as to the land pointed out were being relied upon by plaintiff, and he was therefore obliged to speak correctly concerning the same: *Jackman v. Northwestern Trust Co.*, 87 Or. 209 (170 Pac. 304) [1918]. As stated in *Cawston v. Sturgis*, 29 Or. 331[, 335] (43 Pac. 656) [1896]:

" 'When a party undertakes to make representations concerning a matter that he is bargaining about with another, he must know what he represents to be true, if he knows that the other party is relying upon his statements. He is held equally responsible whether he actually knew that the representations were false, or whether he negligently made representations without knowing whether they were true or false.' " *Ibid.*

In the present case, defendants knew: (1) that the information given in contract negotiation would be used by plaintiffs in evaluating the desirability of the proposed contract; (2) that plaintiffs would rely on information about what the previous contracts involving the land meant because these prior contracts were to be incorporated into the negotiated contract; and (3) that defendants, directly negotiating with plaintiffs through their agent, were the best source of information as to what previous contracts were intended to provide.

Oregon norms do not exclude the misrepresenters from liability to a reliant party damaged thereby. The majority's view of business ethics will make Oregon a lonely anachronism in the west. For cases from our region holding liable a negligent misrepresenter in a real estate sale setting, *see, e.g., Formento v. Encanto Business Park*, 154 Ariz App 495, 744 P2d 22 (1987) (applying the rule from Restatement § 522 to negligent misrepresentation made by vendor to purchaser in real estate transaction); *Hawkins v. Oakland Title Insurance and Guaranty Co.*, 165 Cal App 2d 116, 331 P2d 742, 747 (1958) (relying on § 552 and a statute); *McCarty v. Lincoln Green, Inc.*, 190 Mont 306, 620 P2d 1221, 1225 (1980) (recognizing right to damages for negligent misrepresentation); *Burien Motors, Inc. v. Balch*, 9 Wash App 573, 513 P2d 582, 586-87 (1973) (failure to disclose zoning law restriction or ignorance of zoning law status).

In 2 Harper, James & Gray, The Law of Torts 409 nn 20ff, § 7.6 (2d ed 1986), those authors recognize and endorse liabilities under section 552 of the Restatement in the type of factual case before us. As Harper, James & Gray, advocate, even where the misrepresentation is innocent,

"What is needed is the recognition that the damage remedy should be available * * * wherever its effect will be to prevent unjust enrichment." *Id.* at 418.

The majority's reference to the parol evidence rule, 315 Or at 162, also seems out of place in this case. The misrepresentation was in writing, admissions proving it are in writing. The Modification of Agreement expressly continues in effect, by reference, the escrow instructions quoted above about which the misrepresentation was made. It contains *no* clause integrating all negotiating representations within its text.[8] To the contrary, it expressly says that all other contracts and escrow instructions remain in force as they were written. The meaning of these in-full-force writings was the subject of the misrepresentation. It did not change or modify any term, as our quotations of those documents previously show. Moreover, defendants needed a unilateral *change* in the escrow instructions to do what they wanted.

Oregon's future commercial interests, including its prospect for international trade growth, are not likely to be served by an outmoded rule[9] that one party in a business transaction may not rely on what she, he, or it is told by the other party. Oregon will be best served by requiring care to not mislead your business "partners." I think that Oregonians believe and expect that the best business is where both sides to a transaction make a profit and are able to invest

---

[8] The majority cites *Hatley v. Stafford*, 284 Or 523, 588 P2d 603 (1978). It does not support excluding evidence of the misrepresentation here. The court stated that exclusionary effect would apply "only * * * where the parties intended the writing to be a final and complete statement of their agreement." 284 Or at 532.

[9] Indeed, the predatory practices permitted by the majority seem more related to the era of Gould and Fisk, over a century ago, than to the practices of today's Oregon business mainstream. They seem based on an urban savagery where all are divided by the "limiting notion" of "us versus them." *See* Frohnmayer, *The New Tribalism*, 53 Or Bar Bull 54 (No. 3, Dec. 1992). As M.C. Escher said in 1958, "Nobody can draw a line that is not a border line. Every line splits a unity into a multiplicity."

in new activities. If the law supported by this dissent were followed, both sides of this transaction could still be business winners. I would uphold the jury verdict, remanding so that a judgment on that verdict may be entered.[10]

### UNIS, J., dissenting.

This court exercised its discretionary power to grant review in this case to resolve the confusion and conflict that exists among the trial bench and bar in this state as to (1) whether negligent misrepresentation is actionable in Oregon for economic (pecuniary) damages alone and, if so, (2) what is the scope of liability for the tort. Today the majority recognizes that negligent misrepresentation is actionable, 315 Or at 159-60, but does not define its scope. The majority discusses "whether, during the parties' arm's-length negotiations, in addition to a duty of honesty, defendants owed plaintiffs a duty to exercise reasonable care in communicating factual information to prevent economic losses to plaintiffs," 315 Or at 160, and concludes that, "in arm's-length negotiations, economic losses arising from a negligent misrepresentation are not actionable." 315 Or at 161-62. More specifically, the majority states that, because "defendants and their representative did not owe any duty to plaintiffs during the negotiations by virtue of a contractual, professional, or employment relationship or as a result of any fiduciary or similar relationship implied in the law * * *, plaintiffs cannot maintain their claim for negligent misrepresentation against defendants." 315 Or at 165.

I agree with the majority that negligent misrepresentation is actionable in Oregon for economic damages alone.[1] I

---

[10] Failing that, consideration of sufficiency of the fraud claim evidence is next in line. Given that the majority is adamant in overturning the jury's verdict and damages award on a negligence theory, I concur that the fraud claim related to the same damages should be considered on remand.

[1] I am pleased to see that the majority has asserted its common-law authority to recognize a new tort without considering its self-imposed methodology of judicial restraint outlined in *G.L. v. Kaiser Foundation Hospitals, Inc.*, 306 Or 54, 59, 757 P2d 1347 (1988), and recently applied in *Hammond v. Central Lane Communications Center*, 312 Or 17, 816 P2d 593 (1991), and *Keltner v. Washington County*, 310 Or 499, 800 P2d 752 (1990). I have expressed my disagreement with those restraints in *Hammond*, 312 Or at 28 (Unis, J., dissenting), and in *Keltner*, 310 Or at 510 (Unis, J., dissenting). In fact, the majority now is determined to exercise its common-law authority on a case-by-case basis in developing the tort of negligent misrepresentation. 315 Or at 159.

would hold that the scope of liability for negligent misrepresentation extends to persons and groups of persons who were foreseen, either because the defendant intended the information for their benefit or because defendant knew that it would be used by them, and who, as a result of their actual and justifiable reliance on negligently-made representations, suffer economic loss. I would conclude that, on the facts of this case, plaintiffs have established a claim for negligent misrepresentation against defendants. I would, therefore, affirm the decision of the Court of Appeals, but in part for different reasons than those advanced by that court.

## I. SCOPE OF LIABILITY
## FOR NEGLIGENT MISREPRESENTATION

While the majority recognizes that the tort of negligent misrepresentation exists in Oregon, the closest the majority comes to explaining what it involves is its statement that "[t]he rule stated in Restatement (Second) of Torts § 552 * * * is close to the mark." 315 Or at 159. I believe that, in recognizing a new tort, the court should define it, that the majority misunderstands and misapplies the difference between duty and foreseeability, and that the majority incorrectly denies liability as a matter of law under the facts of this case.

Essentially three different standards, with variations, have been adopted by the American courts to define the scope of liability for the tort of negligent misrepresentation: (1) the *Ultramares* rule, which was stated in *Ultramares v. Touche*, 255 NY 170, 174 NE 441 (1931).[2] The *Ultramares* rule extends liability for economic loss only to those persons with whom defendant is in a relationship akin to privity;[3] (2) the Restatement (Second) of Torts § 552(2)(a) rule (Restatement rule), under which a defendant is liable for the economic loss suffered by "the person or one of a limited group of persons for whose benefit and guidance he intends to supply

[2] For a recent summary of those jurisdictions which purport to follow the *Ultramares* rule in one form or another, see *Bily v. Arthur Young and Co.*, 3 Cal 4th 370, 11 Cal Rptr 2d 51, 834 P2d 745, 752-55 (1992).

[3] In *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 NY 2d 536, 493 NYS 2d 435, 483 NE2d 110 (1985), the New York court reaffirmed the *Ultramares* rule, but extended it to relationships which are practically equivalent to privity.

the information" or knows will receive and rely on the information;[4] and (3) the foreseeability rule under which liability for negligent misrepresentation extends to include all reasonably foreseeable plaintiffs who, as a result of their actual and justifiable reliance on negligently made misrepresentations, suffer economic damages.[5]

The *Ultramares* rule is essentially based on the contract principle of privity. It defines and limits the scope of duty according to the defendant's state of mind and the agreed-upon expectations of the parties to an underlying contractual relation.

In *Martini v. Beaverton Ins. Agency, Inc.*, 314 Or 200, 838 P2d 1061 (1992), this court declined to apply contract principles to a negligence claim, recognizing that rules that may be proper for a contract action are not proper for a negligence action. The majority departs from this principle in its analysis of contract principles in this tort case. 315 Or at 160-63.

"Negligent misrepresentation is a separate and distinct tort, a species of the tort of deceit." *Bily v. Arthur Young and Co.*, 11 Cal Rptr 2d 51, 74, 834 P2d 745, 768 (1992). Where a person makes false statements, honestly believing that they are true, but without reasonable ground for such belief, I believe that the person should be liable, under certain circumstances, for negligent misrepresentation, a form of

---

[4] Restatement (Second) of Torts § 552(1) (1977) reads:

"One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

"[T]he Restatement rule * * * has somewhat more support than the privity of relationship rule * * *. At least seventeen state and federal decisions have endorsed the [Restatement] rule * * *." *Bily v. Arthur Young and Co.*, 11 Cal Rptr 2d 51, 834 P2d 745, 758-59 (1992) (listing those jurisdictions at note 9).

[5] At least three states have endorsed the reasonable foreseeability rule. *See Rosenblum v. Adler*, 93 NJ 324, 461 A2d 138 (1983); *Citizens State Bank v. Timm, Schmidt & Co.*, 113 Wis 2d 376, 335 NW2d 361 (1983); *Touche Ross & Co. v. Commercial Union Ins.*, 514 So2d 315 (Miss 1987) (all recognizing this rule). *See also* Wiener, *Common Law Liability of the Certified Public Accountant for Negligent Misrepresentation*, 20 San Diego L Rev 233 (1983) (advocating rejection of *Ultramares* rule and adoption of foreseeability rule).

deceit. In contract law, liability is determined and limited by the knowledge and intention of the parties. Plaintiffs' complaint in this case neither asserts a breach of contract nor attempts to enforce any promise made by defendants.

Negligence liability, on the other hand, is based on a paradigm which is fundamentally different than that on which contract liability is predicated. In negligence law, the scope of liability is not determined by a contractual relationship, but by the reasonably foreseeable[6] consequences of one's actions and by considerations of policy that at times limit the scope of the liability. "Tort obligations are in general obligations that are imposed by law on policy considerations to avoid some kind of loss to others. They are obligations imposed apart * * * from any manifested intention of parties to a contract or other bargaining transaction." Prosser and Keeton, Torts 656, § 92 (5th ed 1984).

The majority states that "[o]ur precedents establish that a negligence claim for the recovery of economic losses caused by another must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm." 315 Or at 159 (footnote omitted). The majority misunderstands and misapplies our precedents in two respects. First, the majority misunderstands the distinction between duty and foreseeability. Second, the majority misapplies the limitation on economic damages.

In *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987), quoted and discussed by the majority in footnote 13, 315 Or at 165-66, this court stated:

"In short, unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from the defendant's conduct properly depends on whether that conduct unreasonably created a

---

[6] I believe that negligence law should provide liability for reasonably foreseeable consequences, not for any foreseeable consequences. *See* Forell, *Replacing Pragmatism and Policy With Analysis and Analogy: Justice Linde's Contribution to Oregon Tort Law*, 70 Or L Rev 815, 829-32 (1991) (suggesting that this court describes the test as a factual "foreseeability" test where in practice it applies a "reasonably foreseeable" test).

foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."

This language has become critical in understanding Oregon negligence principles. The majority claims that this language does not dictate a different result than that reached by the majority, but the majority's analysis proceeds from the first part of the statement without regard for the last part of the statement. That is, the first part of the statement suggests that special relationships giving rise to a duty can create liability. Thus, the majority asserts that it must search for a special duty:

"Having recognized the existence of the tort, the central question in the present case becomes whether, during the parties' arm's-length negotiations, in addition to a duty of honesty, defendants owed plaintiffs a duty to exercise reasonable care in communicating factual information to prevent economic losses to plaintiffs." 315 Or at 160.

Then the majority painstakingly discusses a series of cases involving duty, concluding that, "in arm's-length negotiations, economic losses arising from a negligent misrepresentation are not actionable." 315 Or at 161-62. However, all that the majority's analysis has thus far established is that there is no special relationship or duty. But this is only the first part of the *Fazzolari* analysis, and the peripheral part at that.

*Fazzolari* stated that "*unless*" the parties invoke a relationship that "creates, defines, or limits defendant's duty" (which the majority concludes they have not), "the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Fazzolari v. Portland School Dist. No. 1J, supra,* 303 Or at 17. Thus, the majority has seized on the exception and ignored the rule. That rule suggests that foreseeability is the proper inquiry regarding negligence actions.

It is true that the rules of foreseeability have at times been subject to limitations in situations in which, for policy reasons, the damage is too remote to support liability. The *Fazzolari* opinion foreshadowed a more direct statement in *Hale v. Groce,* 304 Or 281, 744 P2d 1289 (1987), which was decided less than eight months after *Fazzolari,* when it

stated, in the context of limiting harm which was foreseeable but remote, that one example of a predictable but remote harm limited by common-law negligence is solely economic harm. *Fazzolari v. Portland School Dist. No. 1J, supra*, 303 Or at 7.[7] In *Hale v. Groce, supra*, 304 Or at 284, the court stated that, when economic loss alone is suffered, "[s]ome source of a duty outside the common law of negligence is required," *i.e.*, that foreseeability alone is not enough to establish liability. Apparently the majority seizes on its duty analysis because of statements like this which suggest that a duty is required when purely economic damages are involved. The majority fails to recognize that this extra "special duty" requirement arises in the context of economic damages which are, by definition, very remote, such that the special duty would create or expand liability. The precedents suggest a limitation on remote damages in the context where economic damages were remote, not a limitation on economic damages *per se*.

---

[7] The majority mistakenly takes this language in *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987), to suggest a rule against recovery for purely economic damages solely because they are economic, 315 Or at 165-66 n 13; *Fazzolari* clearly referred to economic damages in the context of *remoteness* because in normal negligence the direct harm is physical injury and economic harm is secondary:

> "[T]he 'duty' concept was retained in negligence law. Bounds of liability must be stated somehow if the law was not to make one insure the world at large against all harm from one's negligent conduct. Although negligent conduct caused harm in fact, the law might deny liability if this harm did not seem 'natural' and 'proximate' but 'remote,' words which again focused on foreseeability in a factual setting. * * * But because common-law negligence traditionally has excluded some categories of quite predictable injuries and claimants (familiar illustrations include solely economic or psychic injuries, injuries due to a bystander's failure to rescue and injuries to trespassers), courts still find lack of a 'duty' a convenient label for these categorical rulings." *Fazzolari v. Portland School Dist. No. 1J, supra*, 303 Or at 6-7 (footnotes omitted).

The majority's parenthetical description of *Norwest v. Presbyterian Intercommunity Hosp.*, 293 Or 543, 561, 652 P2d 318 (1982), involving psychic injuries itself demonstrates that the rationale is not the type of injury (here, psychic but *non-economic*) but the *remoteness* of the injury. The majority's parenthetical described the case as "denying recovery to child for *foreseeable* damages sustained as a result of mother's bodily injury, in part because general negligence law in Oregon does not recognize the recovery of damages for psychic injuries suffered by one *not directly injured* by the negligent conduct." 315 Or at 165-66 n 13 (some emphasis added). *Cf. Hammond v. Central Lane Communications Center, supra*, 312 Or at 28-32 (Unis, J., concurring in part, dissenting in part); Note, *Hammond v. Central Lane Communications Center: Oregon Rejects Negligent Infliction of Severe Emotional Distress Through the Back-Door Policymaking of Judicial Restraint*, 71 Or L Rev 219 (1992).

In *Hale v. Groce, supra*, the context was a claim against an attorney for negligence in drafting a will which failed to provide for a gift to plaintiff intended by the testator. The tort was only cognizable because of a duty arising from the plaintiff's status as the intended beneficiary of the defendant's conduct. The court reasoned that, absent the contractual undertaking in that case, "plaintiff's tort claim would confront the rule that one ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property." *Id.* at 284.

The basis for the rule stated in *Hale v. Groce* that "one ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property" was not a distinction between economic loss and injury to person or property. Rather, the basis for the rule, alluded to in *Fazzolari v. Portland School Dist. No. 1J, supra*, 303 Or at 7, was a distinction between direct and remote harm; where the direct harm is to the person or property of one person, resulting economic harm to a third person is too remote, as a policy matter, to be cognizable in negligence. *Hale v. Groce, supra*, 304 Or at 284, cited two cases to support this proposition. In *Ore-Ida Foods v. Indian Head*, 290 Or 909, 627 P2d 469 (1981), which involved a claim by decedent's employer against the person accused of causing decedent's death and thus of causing harm to employer who then had to pay death benefits, this court stated:

> "We believe that the denial by other courts of claims for economic loss arising from injury to third persons, although phrased in terms of lack of foreseeability, duty and proximate cause, actually reflects their policy decision to limit recovery of such damages. The number of economic interests which could be damaged from an act are, in some cases, practically limitless * * *." *Id.* at 917.

In the other case, *Snow v. West*, 250 Or 114, 440 P2d 864 (1968), this court did not allow an employer to recover lost profits based on the loss of services of his employees caused by defendant, whose negligent driving caused an accident, killing one and injuring six employees. Likewise, in *Hale v. Groce*, the basis for statement of the rule preventing the recovery of economic damages alone was the remoteness of the economic injury to a third person, which in that case was overridden by plaintiff's contractual status as a third party beneficiary.

Thus, in these cases involving economic harm, foreseeability was not enough to establish liability: "It does not suffice that the harm is a foreseeable consequence of negligent conduct that may make one liable to someone else * * *." *Hale v. Groce, supra*, 304 Or at 284. The majority fails to recognize that this was true not because the harm alleged was economic, but because it was too remote. As such, the majority's discussion of duty, 315 Or at 160-61, is applicable to a case involving economic damage to secondary, remote plaintiffs, but that is not this case.[8]

Thus, economic damage to a third party based on some other underlying injury, while it is foreseeable, is too remote to be actionable as a general rule. Where the underlying injury is itself economic, however, the same rationale supports liability for direct economic harm, with limitations for more remote economic harm.

Those principles are consistent with the recognition of the tort of negligent misrepresentation for economic loss alone where that economic harm is the primary harm caused by defendant's negligence and is foreseen, either because the defendant intended the information for their benefit or because defendant knew that it would be used by them, and who, as a result of their actual and justifiable reliance on negligently-made representations, suffer economic loss. The damage is not so remote as to prevent a claim for negligent misrepresentation when a person represents something to be true and actually foresees, or even expects, that identifiable persons will rely on the statement or information (to their detriment if the information is wrong, which is another way of saying that the reliance on the statement caused harm because the statement was false). If the situation is such that the plaintiff's reliance is not only reasonably foreseen by defendant, but is also justified, defendant should be liable to

---

[8] Indeed, the majority's focus on whether the injury is economic produces perplexing results in the context of the majority's recognition of the tort of negligent misrepresentation. Imagine that a party receives the gratuitous advice of a contractor, who negligently misrepresents that a house is structurally sound when it is not, and from an accountant, who negligently misrepresents that a company's books are sound when they are not. The person enters the house, which collapses, causing him serious bodily injury, and buys stock in the company, which collapses, causing him serious economic loss. Apparently the majority would distinguish between these two situations based on the type of injury which befell plaintiff, which makes no sense at all. Both injuries were equally direct.

plaintiff if he fails to use reasonable care in imparting information, *i.e.*, if he does so negligently. Defendant's failure to meet the standard should give rise to liability for plaintiff's harm even if the harm is economic where the harm is not remote.

I believe that this standard is consistent with the Restatement (Second) of Torts § 552:

"(1)   One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"(2)   Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

"(a)   by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

"(b)   through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

"(3)   The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them."

That is, the liability under the Restatement rule extends not to all persons who could rely on the information, but to only those persons, or groups of persons, who were foreseen, either because the defendant intended the information for their benefit or because the defendant knew that it would be used by them. Restatement (Second) of Torts § 552(2)(a). Under the Restatement rule, liability is imposed on the supplier of information to a person or to third persons who are intended recipients of the information. The scope of the tort of negligent misrepresentation should be limited in one other significant respect: The pecuniary loss must be

caused by *justifiable* reliance on the information. Restatement (Second) of Torts § 552(1). It may be that, in a particular arm's-length transaction between sophisticated parties, reliance on the information provided by the other party or on the other party's interpretation of contract language is not justified. Normally this is a question for the jury. In this case, the jury answered it, and I would not disturb their finding.

The majority suggests that its analysis is consistent with the Restatement (Second) of Torts § 552. 315 Or at 164. I disagree. First, the majority states its rule with respect to "nongratuitous suppliers of information" to "clients or employers or to intended third-party beneficiaries." 315 Or at 165. The Restatement is not so limited, however, and is not based solely on a contractual relationship. Rather, the Restatement is based on negligence principles of foreseeability, limited to exclude remote plaintiffs, and does not require compensation giving rise to a contractual obligation:[9]

> "[Liability is limited to loss suffered] by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it * * *." Restatement (Second) of Torts § 552(2)(a).

I believe that the facts of this case present a prime example of the type of relationship in a commercial transaction contemplated by the Restatement rule. Plaintiffs are the persons for whose benefit and guidance defendants intended to supply the information in order to secure a monetary gain through plaintiffs' reliance on that information. Plaintiffs

---

[9] The focus of Restatement (Second) Torts §552(1) is on whether a defendant had a pecuniary interest in the transaction, not on whether the information was provided gratuitously. Comment c, in explaining the pecuniary interest language, states: "If a [defendant] has no pecuniary interest and the information is given purely gratuitously, he is under no duty to exercise reasonable care and competence in giving it." Comment d explains:

"The defendant's pecuniary interest in supplying the information will normally lie in a consideration paid to him for it or paid in a transaction in the course of and as a part of which it is supplied. It may, however, be of a more indirect character. Thus the officers of a corporation, although they receive no personal consideration for giving information concerning its affairs, may have a pecuniary interest in its transactions, since they stand to profit indirectly from them, and an agent who expects to receive a commission on a sale may have such an interest in it although he sells nothing."

*See also* Restatement (Second) Torts § 552, comments g & h and illustrations 4-11.

purchased from defendants real estate parcels with the intent of subdividing them and reselling the parcels at a profit. As previously stated, the scope of liability for tort should not be determined by contract principles.

Second, the majority suggests that liability for negligent misrepresentation can only arise in "relationships other than the relationship between persons negotiating at arm's length." 315 Or at 164.[10] While it may be that, in practice, some courts have not extended liability based on § 552 to parties in an adversarial negotiating relationship, as some authorities cited by the majority suggest, neither those courts nor those authorities have suggested that such a result is a *per se* rule based on the language of § 552. I believe that the majority has misconstrued § 552 to *per se* prohibit liability arising from an adversarial negotiating relationship.

Rather, the proper inquiry under § 552(1) is whether plaintiffs' reliance on defendants' representation was foreseen by defendants and whether such reliance was *justified*. That should be a factual question. Perhaps as between some sophisticated adversaries with equal access to the critical information, a party would not be justified to rely on a representation from the adversary. It is not clear whether this is the situation contemplated by the majority's reference to persons negotiating at "arm's length," or whether that term encompasses more. Having failed to define the components of arm's-length negotiations, it is unclear how the majority can summarily decide that the parties to this transaction were negotiating at arm's length. Perhaps they were, but we are not told how that is to be determined.

I believe that, rather than introducing the extraneous concept of arm's-length negotiations to determine the applicability of § 552, we should examine the terms of § 552.

For reasons stated above, I disagree with the majority's restrictive view of the scope of liability for the tort of negligent misrepresentation. Under the majority's rule, there would be no liability in an action based on the tort of negligent misrepresentation unless "defendants and their

---

[10] Thus, the majority is saying that the duty must necessarily arise from a contractual relationship (*i.e.*, be nongratuitous), but cannot arise between parties to a contract.

representative * * * owe[d a] * * * duty to plaintiffs during the negotiations by virtue of a contractual, professional, or employment relationship or as a result of any fiduciary or similar relationship implied in the law." 315 Or at 165.

In sum, I would hold that negligent misrepresentation liability extends to persons or groups of persons who were foreseen either because the supplier of the information intended the information for their benefit or because the supplier of the information knew it would be used by them, and who, as a result of their actual and justifiable reliance on negligently-made representations, suffer economic loss.

## II. PLAINTIFFS ESTABLISHED THEIR NEGLIGENT MISREPRESENTATION CLAIM

Plaintiffs obtained a jury verdict on their negligent misrepresentation claim. The facts, therefore, are construed in the light most favorable to plaintiffs. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984). The majority's statement of the factual background concerning plaintiffs' negligent misrepresentation claim is in accord with that principle. Additional facts are summarized in the Court of Appeals opinion. *Onita Pacific Corp. v. Trustees of Bronson*, 104 Or App 696, 803 P2d 756 (1990). I wish to emphasize certain facts which are central to plaintiffs' negligent misrepresentation claim and which demonstrate that in this case plaintiffs did establish enough for a jury to conclude that their negligent misrepresentation claim was valid. Those facts are: Warde Erwin represented that deeds could be released on the payment into escrow of a specified sum. Lawrence Erwin, defendants' attorney, represented that deeds could be released and that $200,000 payment would result in the release to plaintiffs of lots worth $200,000. Lawrence Erwin represented that if escrow were moved, the escrow instructions would remain the same and that if the $200,000 were processed through his (Lawrence Erwin's) trust account, deeds would be released on the same terms as if the $200,000 had been processed through the title company escrow. However, once the $200,000 was paid and processed through Lawrence Erwin's trust account, defendants refused to release any deeds. Defendants insisted that the deeds could be released only on the sale of a lot to a third party. Defendants also issued new instructions that prevented plaintiffs from

obtaining the release of the lots from the new title company escrow based on the payment that plaintiffs had made. As a result of defendants' refusal to release the deeds, plaintiffs were unable to obtain financing to develop the lots for resale, and they defaulted on their obligation to Compton. Compton then foreclosed on the security that plaintiffs had pledged, *viz*, plaintiffs' interests as assignees of the Hatch contract, as well as certain other property.

In the language of § 552(1), liability is limited to situations in which reliance is justified. In this case the jury found that plaintiffs' reliance on defendants' misrepresentation was justified. Plaintiffs were foreseen, intended recipients of defendants' conduct. We should not disturb that finding by conclusory references to the extraneous concept of arm's-length negotiating, even if it is true that in some circumstances an adversarial negotiating relationship would make reliance unjustified. There is ample evidence in the record of this case to support a finding that plaintiffs have established their negligent misrepresentation claim against defendants.

## III. CONCLUSION

In conclusion, I agree that negligent misrepresentation is actionable in Oregon, but I would define the tort and hold that plaintiffs have established their claim against defendants for that tort. I would, therefore, affirm the decision of the Court of Appeals, but for different reasons than those advanced by that court. I, therefore, respectfully dissent.