80 April 23, 2025 No. 361

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

Stephen K. DAILEY,
*Plaintiff-Appellant,*

*v.*

UNIVERSITY OF PORTLAND,
*Defendant-Respondent.*

Multnomah County Circuit Court
23CV22882; A183476

Beth A. Allen, Judge.

Argued and submitted March 21, 2025.

Kevin Brague argued the cause and filed the briefs for appellant.

Melissa Lehane Rawlinson argued the cause for respondent. Also on the brief was Michael Porter and Miller Nash LLP.

Before Tookey, Presiding Judge, Jacquot, Judge, and Kistler, Senior Judge.

KISTLER, S. J.

Reversed as to the contract claim; otherwise affirmed.

## KISTLER, S. J.

Plaintiff appeals a judgment dismissing his contract and negligence claims. He argues that the trial court erred, in ruling on summary judgment, that statements in defendant's handbooks did not give rise to contractual obligations and that no special relationship existed that would permit him to recover economic and emotional distress damages. We affirm the trial court's judgment in part and reverse it in part.

Because this case arises on defendant's motion for summary judgment, we set out the historical facts in the light most favorable to plaintiff and draw all reasonable inferences from those facts in his favor. Defendant's school of nursing offers a doctor of nursing practice degree. That degree allows students who are registered nurses to be licensed as nurse practitioners, which in turn permits them to exercise greater responsibility in caring for their patients.

In 2015, defendant accepted plaintiff as a student in its doctoral nursing program. A student in that program can pursue one of three tracks. Plaintiff chose the track that would permit him to graduate with a degree as a family nurse practitioner. To obtain that degree, plaintiff had to complete a specific sequence of academic and clinical courses within a six-year period.

In 2017, plaintiff took a reduced course load to care for his wife, who was suffering from cancer. In 2018, he took a leave of absence because of his wife's illness. Three years later, defendant granted plaintiff's application to re-enroll in its doctoral nursing program. It also extended the deadline for completing his academic and clinical courses to 2023.

Plaintiff's first clinical course began in the fall 2021 semester. Difficulties arose, however, in finding a suitable clinic. His initial clinical placement was canceled, and he was unsuccessful in securing a potential clinical placement in Bend. According to plaintiff, those difficulties arose because defendant had accepted more nursing students than it could place in suitable clinics.

After the fall 2021 semester began, defendant told plaintiff that a clinical placement was available in Grants Pass, which plaintiff accepted. Each nursing student in a clinic is supervised by a medical professional, who is referred to as a preceptor. Defendant's bulletin listing its courses states:

"Ideally, the [doctor of nursing practice] student preceptor is an advanced practice registered nurse (APRN), although students may also be precepted by MDs, DOs, PAs, and CNMs. In adherence to the Oregon State Board of Nursing's requirements, all students must have a minimum of 51% of their total program clinical hours precepted by a licensed APRN within the same APRN role."[1]

Additionally, defendant's bulletin states that APRNs who serve as preceptors must have a minimum of 2,080 hours licensed experience, which it describes as approximately two-years of licensed experience.

The preceptor who supervised plaintiff during the fall 2021 clinical course was available only part of the time. Despite her limited availability and despite the initial delay in finding an available clinical placement, plaintiff completed his first clinical course successfully. The preceptor who supervised plaintiff during the fall 2021 semester was not available during the spring 2022 semester. Two other preceptors took her place. Plaintiff asserts that neither of those preceptors was qualified to supervise him because each lacked 2,080 hours of experience as a licensed nurse practitioner.[2]

According to plaintiff, the two preceptors gave him positive feedback on his work during the spring semester. However, at some point before April 15, 2022, defendant

_____

[1] A clinical nurse specialist, a nurse practitioner, and a certified registered nurse anesthetist qualify as APRNs. *See* ORS 678.025.

[2] Contrary to plaintiff's assertion, one preceptor who supervised him during the spring semester appears to have had the requisite experience. Plaintiff submitted records in response to defendant's summary judgment motion that one preceptor who supervised him in spring 2022 received her license as a nurse practitioner on October 2, 2019. She thus would have had more than two years of experience as a licensed nurse practitioner before the spring 2022 semester began. If she worked 40 hours per week for 50 weeks each year, she would have had approximately 4,000 hours of licensed experience by January 2022. As plaintiff correctly notes, a reasonable juror could infer that the other preceptor had less than 2,080 hours of licensed experience as a nurse practitioner.

received negative feedback on plaintiff's performance, which resulted in defendant's sending plaintiff a "development and improvement plan" form. That form notifies the student about complaints, provides the student with an opportunity to respond in writing, and allows the student and faculty adviser to form a plan to correct any deficiency. The record does not disclose the complaint that gave rise to plaintiff's receipt of the form, nor does it disclose how any deficiency was resolved.

At the end of the spring semester, plaintiff's graduate adviser gave him a no-pass grade for the clinical course that semester. There is no direct evidence in the record as to why plaintiff received that grade.

In May 2022, plaintiff met with his graduate advisor, a clinical instructor, and the academic dean for the nursing school. Initially, the graduate advisor told plaintiff that he was being dismissed from the school of nursing. At some later point, the dean told plaintiff that he was not being dismissed, that he remained a student in good standing, and that the dean would provide him with a letter of recommendation. The dean explained that plaintiff could obtain his degree only if he successfully retook the spring 2022 clinical course. He added, however, that plaintiff could not retake the spring 2022 clinical course and complete the remaining academic and clinical courses needed for his degree by 2023, the deadline for obtaining the degree. Finally, the dean told plaintiff that his tuition, presumably for the spring 2022 semester, would be refunded if he withdrew from the university that day.

Plaintiff withdrew and brought this action for breach of contract and for negligence, seeking economic and emotional distress damages. As we understand plaintiff's arguments, both his contract and negligence claims rest on the factual premise that the clinical opportunities defendant provided were deficient (particularly the absence of qualified preceptors during the spring 2022 semester) and that defendant's failure to provide adequate clinical opportunities effectively resulted in plaintiff's forced withdrawal from the university, which in turn led to his economic and emotional distress damages.

Defendant moved for summary judgment on both claims for relief. We begin with plaintiff's contract claim.

As we understand defendant's summary judgment motion, its argument ran as follows. Plaintiff's contract claims are based on statements contained in three documents that defendant provided its students: a graduate nursing handbook, a general student handbook, and an online bulletin listing its course offerings. Defendant observed that each of those documents contained a disclaimer, each of which expressly provided that no statements contained in that document gave rise to contractual obligations.

In defendant's view, those disclaimers were dispositive. Put differently, defendant appears to have assumed, for the purposes of its summary judgment motion, that the statements in its handbooks and online bulletin could give rise to contractual obligations in the absence of its disclaimers. It argued, however, that the disclaimers prevented those statements from being converted into binding contractual obligations.

Plaintiff responded that the Oregon Supreme Court recognized over 100 years ago that, when students rely on statements in a university handbook describing the prerequisites for obtaining a degree, those statements become contractually binding obligations. *See Tate v. North Pacific College*, 70 Or 160, 165, 140 P 743 (1914).[3] He argued that the same rule applies here. Alternatively, he argued that the disclaimers on which defendant relied were not valid because they were not conspicuous, they were ambiguous, and they violated public policy. The trial court was not persuaded by plaintiff's arguments; rather, it found the disclaimers dispositive and granted summary judgment on that basis. The parties essentially reiterate their arguments on appeal.

With that preface, we turn to the two documents on which plaintiff's contract claim rests—the graduate nursing handbook and its online bulletin describing its course

---

[3] The court recognized in *Tate* that statements in a university's handbook can give rise to contractual obligations; that is, the court assumed that, if the plaintiff had satisfied the degree requirements set out in the university's handbook, the university's refusal to give him a degree would have breached its contractual obligations. 70 Or at 165. The court held, however, that the university had not acted arbitrarily in giving the plaintiff a failing score on a required examination, which meant he was not eligible under the terms set out in its handbook to receive the degree. *Id.* at 168-69.

offerings.[4] We begin with the graduate nursing handbook. After describing defendant's program for doctoral nursing students, the handbook states:

> "The program incorporates professional standards and guidelines from [six publications identifying standards and competencies] for students in the [family nurse practitioner] track, [one publication listing competencies] for students in the [adult gerontology primary care nurse practitioner track], and the Oregon State Board of Nursing in preparation of the curriculum and evaluation of outcomes."

Plaintiff reasons that the last reference to standards and guidelines from the Oregon State Board of Nursing incorporated either all or part of the rules set out in OAR chapter 851, governing the standards that a nursing education program must meet. He contends that those rules gave rise to the contractual obligations that defendant breached.

As noted above, defendant based its summary judgment motion on the disclaimer found on the first printed page of the graduate nursing handbook. It argued that that disclaimer precluded the formation of any contractual obligations based on that handbook's contents. The disclaimer states:

> "The School of Nursing Graduate Student Handbook has been written to provide the student with information specific to the curriculum, student rights and responsibilities, campus facilities, and resources related to nursing students. It is meant to augment, not supersede, information provided in [a general student handbook and a bulletin setting out defendant's course offerings]. Every effort has been made to ensure its accuracy. *Its contents do not constitute a contract between the School of Nursing (SON) and its students.* If regulations, program requirements, or services described herein conflict with more current practice, the latter will prevail."

(Emphasis added.)

---

[4] Plaintiff argues that each document independently gives rise to his contract claim. Plaintiff has asserted that other documents, including the general student handbook, gave rise to his contract claim. However, he has not identified any statement in any document other than the graduate nursing handbook and the online bulletin that allegedly gave rise to the contractual obligations that defendant breached.

As defendant argues, we have long recognized that conspicuous disclaimers can prevent statements in a handbook or manual from giving rise to contractual obligations. *Mobley v. Manheim Services Corp.*, 133 Or App 89, 93-94, 889 P2d 1342, *rev den*, 321 Or 47 (1995); *Gilbert v. Tektronix, Inc.*, 112 Or App 34, 37-38, 827 P2d 919, *rev den*, 313 Or 299 (1992). In this case, defendant's disclaimer is conspicuous. It follows immediately after the table of contents and is on the first page of text in the graduate nursing handbook. *See American Wholesale Products v. Allstate Ins. Co.*, 288 Or App 418, 427-28, 406 P3d 163 (2017) (holding that a similar disclaimer was conspicuous). The disclaimer is not ambiguous, and plaintiff did not raise a claim below, as he attempts to do on appeal, that the disclaimer is void in violation of public policy.[5]

Plaintiff identifies a second independent source for defendant's contractual obligation—defendant's online bulletin listing its course offerings. In moving for and opposing summary judgment, the parties submitted screenshots from defendant's bulletin that identify part of its contents. Those screenshots, however, provide little help in determining whether defendant's disclaimer is placed conspicuously on the website where its bulletin can be found. That is, the screenshots reveal what various webpages say, but they provide no insight into determining how prominent or conspicuous the webpage containing the disclaimer is.

The affidavit in support of defendant's motion for summary judgment provides greater help. It includes a link to the specific webpage in the 2021-22 bulletin on which its disclaimer is found; moreover, as the affidavit notes, the link provides full access to the 2021-22 bulletin. The opening page or homepage of the 2021-22 bulletin contains a

---

[5] At oral argument, plaintiff raised an additional argument. He contended that defendant owes him other contractual obligations that the disclaimer does not negate. Even if that is true, it is difficult to see how that argument advances his contract claim here. To the extent that plaintiff's contract claim in this case is based on statements in the graduate nursing handbook, the disclaimer prevented those statements from becoming contractual obligations. *Cf. Mobley*, 133 Or App at 94-95 (holding that a disclaimer in an employee's manual prevented statements in that manual from conferring specific contractual rights without questioning whether the plaintiff retained the contract right to be paid at the agreed price for the work he had performed).

picture of the university. To the left of that picture is a table of contents for the bulletin that lists 24 subjects. The list begins: "University Calendar," "The University of Portland," "General Information," "University Academic Programs of Study," and so on. In order to find the disclaimer, a reader must click on the link captioned "The University of Portland." Doing so takes a reader to a webpage displaying a second table of contents that lists nine subjects. That list begins: "Notes About This Bulletin," "Contacts," "Equal Opportunity and Nondiscrimination Policy," and so on. Only if a reader clicks on the link captioned "Notes About This Bulletin" will they come to the disclaimer on which defendant relies.

We cannot say, as a matter of law, that the disclaimer is conspicuous. Nothing on the homepage suggests that any disclaimer will be found under the heading "The University of Portland" rather than the heading "General Information" or elsewhere. Indeed, a casual reader could not be faulted for thinking that the heading "The University of Portland" would lead to a discussion of the history of the university, its founders' mission, or a travelogue-type discussion of the university's scenic location overlooking the Willamette River.

If a reader happened to click on the link captioned "The University of Portland," and noted the table of contents that appeared, the caption "Notes About This Bulletin" might suggest that that subject contained pertinent information, such as a contract disclaimer. "Notes," however, is a general term that does not identify the type of notes that might be included on that webpage. Only if reader went through two relatively opaque webpages would they find the disclaimer.

To be sure, the website for the bulletin contains a search function. A search function, however, provides a useful means of discovering the disclaimer only if a reader is aware that a disclaimer might exist and is actively looking for it. Beyond that, plaintiff's counsel submitted an affidavit in opposition to summary judgment stating that he did not find the disclaimer using the search function. We cannot say on summary judgment that the disclaimer in defendant's

bulletin is conspicuously or prominently displayed on defendant's website; instead, it is tucked away in a mousehole. *Cf. Anderson v. Ashland Rental Inc.*, 122 Or App 508, 510-11, 858 P2d 470 (1993) (holding that a limitation on warranties was not conspicuous because it was printed using a small font and light typeface). The trial court erred in granting summary judgment on plaintiff's contract claim based on the disclaimer in defendant's bulletin.[6]

Our holding on plaintiff's contract claim is narrow. We hold only that the disclaimer in defendant's bulletin does not prevent the statements in that bulletin from giving rise to contractual obligations. As we read defendant's brief on appeal, it does not ask us to uphold the trial court's ruling on another ground under the "right for the wrong reason" doctrine. Indeed, in light of the narrow focus of defendant's summary judgment motion, applying that doctrine could raise procedural problems. *See Two Two v. Fujitec America, Inc.*, 355 Or 319, 324-25, 325 P3d 707 (2014) (explaining, but not holding, that ORCP 47 C requires the party with the burden of proof to offer evidence only on the issues raised in the summary judgment motion). We accordingly express no opinion on any other contract issues that might arise on remand.

We turn to plaintiff's negligence claim. Plaintiff seeks to recover economic and emotional distress damages based on defendant's allegedly negligent failure to provide adequate clinical opportunities and instruction. Ordinarily, in the absence of a physical injury, the damages that plaintiff seeks are not available for mere negligence. *See Moody v. Oregon Community Credit Union*, 371 Or 772, 784-85, 542 P3d 24 (2023) (emotional distress damages); *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 159, 843 P2d 890 (1992) (economic loss). As the court explained in *Moody*, the potential for unlimited liability when a plaintiff seeks emotional distress damages flowing from mere negligence is so

---

[6] Defendant argued at oral argument that the disclaimer in its graduate nursing handbook applies to the statements in the bulletin. The disclaimer in the graduate nursing handbook, however, states that "[i]ts contents" do not create contractual obligations. The disclaimer in the general student handbook is similarly limited. By their terms, those disclaimers do not apply to the contents of defendant's other documents. At least, we cannot say so on summary judgment.

great that courts have restricted either the class of plaintiffs who can seek those damages or the instances in which they are recoverable. *See* 371 Or at 785 (citing *Philibert v. Kluser*, 360 Or 698, 703-04, 385 P3d 1038 (2016)); *accord Onita Pacific Corp.*, 315 Or at 159 (economic loss).

Plaintiff does not dispute those general principles. Rather, he relies on rules promulgated by the Oregon State Board of Nursing (the board) that establish the standards a nursing education program must meet. He argues, among other things, that those regulations provide an independent standard of care that permits him to recover economic and emotional distress damages. Alternatively, and perhaps additionally, he argues that, as a matter of Oregon common law, a "special relationship" existed between the parties that imposed a heightened standard of care on defendant. That was sufficient, in plaintiff's view, to allow him to recover economic and emotional distress damages.

Before addressing plaintiff's rule-based argument, we first describe briefly the applicable statutory and regulatory structure. ORS chapter 678 authorizes the board to establish standards for licensing different classifications of nurses; to prescribe the tasks that each classification of nurses can perform; to determine whether applicants for specific nursing licenses are qualified; and to "prescribe standards and approve curricula for nursing education programs in this state." ORS 678.150(5), (6)(a)-(i). Pursuant to the last delegation of legislative authority, the board has adopted rules that identify the standards nursing programs in Oregon must meet before the board will approve them to educate nursing students.

As applicable here, the board's rules describe the subjects that nursing programs offering nurse-practitioner degrees must include in their curriculum. *See* OAR 851-051-0020(2)(a)-(e). They prescribe the professional licenses that the faculty who educate nurse practitioners must have. OAR 851-051-0020(4). And they specify the professional licenses that preceptors must have to supervise those students in clinics; among other things, the board's rules require that preceptors have "[a] minimum of 2080 hours of licensed practice." OAR 851-051-0020(5)(A), (D).

If a nursing education program meets those and other standards, the board will approve that program "for a period of three years with subsequent approvals aligning with the frequency of national program accrediting surveys." OAR 851-051-0050(1). Nursing education programs that receive board approval must submit a report to the board if certain changes occur in their programs, such as moving to another location. OAR 851-051-0050(4) (listing the changes that will require a report). The board also retains authority to make interim site surveys to address issues reported to it. OAR 851-051-0050(3). Finally, the board's rules provide that, "[i]f, in the opinion of the [b]oard, the established standards for a new or existing program are not being met, notice must be made to the program specifying the deficiencies and the time frame within which correction must occur." OAR 851-051-0050(2). The board's rules thus vest the board with the authority and discretion to decide how to enforce the rule-based standards on which its approval of nursing education programs depends.

With that background in mind, we return to plaintiff's arguments. Plaintiff relies on the board's rules for a series of related but separate propositions. At the most basic level, he appears to argue that the board's rules establish a standard of care that is separate from and higher than the standard of care that ordinarily applies in negligence actions—namely, the obligation to avoid "unreasonably creat[ing] a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *See Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987). Even if that is true, that does not advance his claim. It merely establishes that a higher standard of care applies, not that he necessarily can recover economic and emotional distress damages for a breach.

Additionally, plaintiff relies on the board's rules as a basis for arguing that he can assert a negligence claim independently of his contract claim. *See Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 106, 831 P2d 7 (1992) (explaining that a party can bring contract and tort claims arising out of a contractual relationship when the two claims turn on separate standards of care). Again, even if we assume

that the board's rules provide a separate standard of care from his contract claim, that does not necessarily establish that plaintiff can recover economic or emotional distress damages if defendant negligently fails to follow those rules.

Finally, plaintiff argues that our decision in *Moody v. Oregon Community Credit Union*, 317 Or App 233, 505 P3d 1047 (2022), *aff'd on other grounds*, 371 Or 772, 542 P3d 24 (2023), establishes that his negligence claim is actionable. In our view, both our opinion and the Supreme Court's opinion in *Moody* cut against plaintiff's claim here. The question in *Moody* was whether the beneficiary of a life insurance policy could recover emotional distress damages when the insurer "negligently performed its obligations under [ORS] 746.230 in its review, investigation, and eventual decision to deny insurance benefits[.]" 371 Or at 776 (internal quotation marks omitted).

The Supreme Court and we differed over the role that ORS 746.230 played in the plaintiff's tort claim. We held that the plaintiff could rely on that statute to state a negligence *per se* claim for emotional distress damages without first showing that the plaintiff had an actionable common-law negligence claim. 317 Or App at 241-43. The Supreme Court disagreed with that conclusion. 371 Or at 781-82. It explained that a plaintiff could state a negligence *per se* claim for emotional distress damages only if the plaintiff had an existing common law negligence claim for those damages. *Id.* at 782. Addressing that issue, the Supreme Court reasoned that the statute on which the plaintiff relied was relevant to the extent it indicated that the insurer's negligence invaded a separate, appropriately cabined legally protected interest. *Id.* at 783-92. As the Supreme Court's discussion of that issue illustrates, the issue is not a simple one.

Ultimately, however, both our and the Supreme Court's conclusion that the plaintiff had stated an actionable negligence claim for emotional distress damages rested on the premise that the statute on which the plaintiff relied reflected a legislative intent to protect the plaintiff's peace of mind. *See* 371 Or at 798-800. The Supreme Court explained that people buy insurance policies not only for the monetary payout those policies provide when a covered loss occurs but

also to provide the policyholder with peace of mind. *Id.* at 797-98. The court reasoned that the statutory requirement that insurers promptly investigate and pay valid claims was intended to "'ensure that the insurance-buying public gets what it pays for, including the peace of mind that is a *principal* benefit of an insurance policy.'" *Id.* at 798 (quoting *Moody*, 317 Or App at 247 (emphasis added)).

Given that statutory purpose, the court concluded, after further analysis, that the applicable statutes identified a separate "legally protected interest" that permitted the plaintiff to recover emotional distress damages flowing from the defendant's negligent failure to promptly investigate and pay her life insurance claim. We need not pursue the lengthy analysis that the Supreme Court laid out in *Moody* to resolve plaintiff's reliance on the board's rules here. Unlike the statutes on which the plaintiff relied in *Moody*, a principal purpose of board's rules is not to protect students' economic and emotional wellbeing. Rather, as defendant notes, the stated reason why the board sets standards for nursing education programs is "to foster the safe and effective practice of nursing by [the] graduates of nursing education programs" that the board regulates. *See* OAR 851-021-0000 (stating that purpose).[7] It is for that reason—the protection of the public—that the board approves nursing education programs, decides when a nursing education program is out of compliance with its rule-based standards, and determines the necessary steps to remedy any deficiency. Without a basis for saying that a principal or primary purpose of the board's rules is to protect a student's economic and emotional wellbeing, and plaintiff does not identify one, those rules do not support plaintiff's recovering economic and emotional distress damages resulting from defendant's alleged negligence.

Having concluded that the rules on which plaintiff relies do not support recovering economic and emotional

---

[7] OAR 851-021-0000 states the purpose for providing standards for programs educating practical and registered nurses. OAR 851-051-0020 provides standards for programs educating nurse practitioners. Although OAR 851-051-0020 does not repeat the purpose identified in OAR 851-021-0000, we conclude that the stated purpose applies equally to the standards the board sets for programs educating nurse practitioners.

distress damages for their breach, we turn to his common-law argument that a special relationship exists that permits the recovery of those damages. The seminal case on that issue is *Onita Pacific Corp.* The plaintiffs in that case had purchased several lots from the defendants and had relied on the defendants' representation that the escrow agent would be instructed to release some of the lots immediately once the sale closed. 315 Or at 153-54. The escrow agent, however, did not release any of the lots immediately, and it turned out that the escrow instructions differed from the defendants' representations. *Id.* at 154-55. The plaintiffs brought an action to recover the economic losses they suffered as a result of the defendants' negligent misrepresentations.

In deciding whether the plaintiffs had stated an actionable negligence claim, the court started from the now familiar proposition that "a negligence claim for the recovery of economic losses caused by another must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm." *Id.* at 159 (footnote omitted). As the court framed the issue, it reduced to whether the "defendants owed [the] plaintiffs a duty to exercise reasonable care in communicating factual information to prevent economic losses to [the] plaintiffs." *Id.* at 160.

Having framed the issue that way, the court reviewed cases in which it had recognized a right to recover economic loss for negligent acts. It explained that some professionals, such as attorneys, engineers, and real estate brokers, owe a duty of care, "at least in part, [of] acting to further the economic interests of the 'client,' the person owed the duty of care." *Id.* at 160-62. The court concluded, however, that no such duty of care existed in arms-length negotiations; as a result, "in arms-length negotiations, economic losses arising from a negligent misrepresentation are not actionable." *Id.* at 161-62. That was true in *Onita Pacific Corp.* even though the plaintiffs in that case had entrusted the defendants with requesting escrow instructions that tracked the representations that the defendants had made.

The court added a gloss on *Onita Pacific* in *Conway v. Pacific University*, 324 Or 231, 924 P2d 818 (1996). In

*Conway*, the court noted that an attribute of a special relationship is that

> "one party has relinquished control over the subject matter of the relationship to the other party and has placed its potential monetary liability in the other's hands. In all those relationships, one party has authorized the other to exercise independent judgment in his or her behalf and, consequently, the party who owes the duty has a special responsibility to administer, oversee, or otherwise take care of certain affairs belonging to the other party."

*Id.* at 241. Applying that standard, the court held that, even though the dean at Pacific University had told a professor (the plaintiff) that poor student evaluations "will not be a problem" in receiving tenure, no special relationship existed between the university and the professor that would permit him to recover economic damages for what turned out to be the dean's negligent misrepresentation. *Id.* at 233-34, 242.

In reaching that conclusion, the court assumed that some provisions in the university's handbook required the dean to act in ways that furthered the professor's economic interests. *Id.* at 242. It concluded, however, that "nothing in those provisions demonstrates that the university had a special responsibility to exercise independent judgment in [the professor's] behalf." *Id.* at 242, 242 n 6. For that reason, *Conway* held that the plaintiff had not stated an actionable negligence claim. *Id.* at 244. Put differently, *Conway* required both a duty to protect against economic loss and the exercise of independent judgment to state a negligence claim for economic loss.

This case is the reverse image of *Conway*. That is, defendant may have exercised independent judgment in deciding which clinical programs were suitable for its students and which preceptors were qualified to supervise them. However, plaintiff identifies no basis for saying that, in exercising its judgment, defendant was acting to further its students' economic and emotional wellbeing. Rather, as explained above, defendant sought to provide a sound education to its students to protect the public—namely, to foster the safe and effective practice of medicine once its students became licensed nurse practitioners.

It may be that providing a sound education to defendant's students will have the incidental effect of increasing their earning capacity and avoiding emotional distress now or in the future once they begin their practice. But that incidental effect is not comparable to the interests that, as a matter of common law, have led Oregon courts to recognize a special relationship that justifies recovering economic or emotional distress damages flowing from a defendant's negligence. *See Curtis v. MRI Imaging Services II*, 327 Or 9, 14-16, 956 P2d 960 (1998) (holding that, "when the standard of care in a particular medical profession * * * dictates that certain precautions be taken to avoid or minimize [adverse psychological reactions]," then the negligent breach of that duty can give rise to emotional distress damages); *see Onita Pacific Corp.*, 315 Or at 160-62 (identifying instances in which the defendant's duty included an obligation, at least in part, to protect another from foreseeable economic loss).

Plaintiff cites no case from Oregon or elsewhere holding that, in the absence of a physical injury, a student can recover economic or emotional distress damages for a university's negligent failure to provide an adequate education. Instead, plaintiff cites a handful of cases from other states that have recognized a school's special duty to protect its students from third-party assaults and other forms of violence. Oregon courts have recognized a similar duty. *See Fazzolari*, 303 Or at 19-20 (holding that high schools owe a "special duty" to their students to take "reasonable precautions against foreseeable risks beyond those that might apply to other persons").

As we read *Fazzolari* and *Onita Pacific Corp.*, they teach that the question whether a special duty or special relationship exists is contextual. The fact that a special relationship exists in one context does not necessarily mean that it exists in another. Put differently, even if universities have a special duty in certain circumstances to protect their students from third-party harm, it does not follow that a special relationship exists to protect those students from economic loss and emotional distress. We conclude that neither the regulations on which plaintiff relies nor the common law cases he cites give rise to a special relationship

in this case that would permit plaintiff to recover economic or emotional distress damages. The trial court correctly granted summary judgment on plaintiff's negligence claim.

Reversed as to the contract claim; otherwise affirmed.